# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DEMARCO NICHOLS,                          )
                                          )
    Plaintiff,                        )
                                          )   12 C 1789
vs.                                       )   Judge Thomas M. Durkin
                                          )
ILLINOIS DEPARTMENT OF                    )
TRANSPORTATION and ILLINOIS               )
DEPARTMENT OF CENTRAL MANAGEMENT          )
SERVICES,                                 )
                                          )
    Defendants.                       )


## MEMORANDUM OPINION AND ORDER

Plaintiff DeMarco Nichols filed this lawsuit under Title VII, 42 U.S.C. § 2000e, against the Illinois Department of Transportation (IDOT) and the Illinois Department of Central Management System (CMS). IDOT is Nichols's former employer, and CMS is a state agency with responsibility for overseeing and implementing the state civil service and personnel code.[1] After ten years of employment, IDOT terminated Nichols effective June 4, 2008 for violation of IDOT's policy against workplace violence. Nichols is Muslim, and he alleges that IDOT discriminated and retaliated against him based on his religion, and refused to accommodate his request for a quiet place to pray while at work. Defendants have

---

[1] Defendants have stipulated that IDOT, and not CMS, is responsible for the employment actions challenged in this matter, and that any potential monetary award against Defendants can be recovered from IDOT. *See* R. 137-36. As a result of this stipulation, the parties agree that CMS will remain a nominal party to this lawsuit solely in the event that injunctive relief is ordered whereby CMS may have some role in the processing of paperwork should reinstatement be ordered. *Id.*

filed a motion for summary judgment. For the reasons that follow, Defendants'
motion is denied.

## BACKGROUND[2]

Nichols was hired by IDOT on March 2, 1998 to work at the I-57 Maintenance
Yard in Markham, Illinois. In or about 2003, he was transferred to the Harvey
Maintenance Yard in Harvey, Illinois. With the exception of one temporary short-
term re-assignment in the spring of 2006, Nichols worked at the Harvey Yard from
2003 until his discharge on June 4, 2008. Nichols's position throughout his ten-year
employment with IDOT was "Highway Maintainer," and one of his primary jobs was
to plow snow during the winter season. During the summer months, Nichols was
given various other tasks to perform. Nichols had relatively few problems during
most of the years in which he was employed at the Harvey Yard, and his supervisor
testified that at no time did he recall Nichols ever exhibiting any type of hostility or
committing any act of violence. *See* R. 137-7 at 217; R. 137-8 at 26. Nichols testified
that for the most part he kept to himself. He received "satisfactory" and occasional
"very satisfactory" job reviews from his supervisor. *See* R. 137-7 at 142, 144-46. His
only dissatisfactory review was in the spring of 2008, when the events at issue in this
lawsuit transpired.

---

[2] The facts in this section are taken from the parties' statements of undisputed facts
and the documents attached thereto. While IDOT argues that Nichols's statement of
additional facts violates Local Rule 56.1, the Court has determined that neither party
has fully complied with that Rule. Accordingly, the Court will not strike any of the
parties' fact statements, and will consider those statements in conjunction with the
record itself in determining IDOT's motion. The Court has only included facts in its
opinion that are adequately supported by evidence in the record.

### A. Nichols Becomes Acting Lead Worker

While at the Harvey Yard, Nichols's direct supervisor was George Martin, whose title was "Yard Technician." The yard technician is in charge of the yard, and is assisted in his duties by two permanent "lead workers" and one "lead lead worker." The permanent lead workers at the Harvey Yard in the early part of 2008 were Robert Thompson and Kevin Reynolds. The lead lead worker in this same period was Frank Romanski.

At some point prior to 2008, IDOT instituted a policy whereby workers in the yard became eligible to apply for a position of "temporary acting lead worker." If an employee volunteered to be a temporary acting lead worker and met the qualification requirements, his name was placed on a list. The yard technician was required to appoint the worker whose name was at the top of the list to act as the temporary lead worker for a two-month period. *E.g.,* R. 137-7 at 101-03, 174-75. The position would then rotate to the person whose name was next on the list. During the two months that a worker was assigned to be an acting lead worker, he would be paid at a higher rate to assist the permanent lead workers in their duties under the supervision of the lead lead worker, who in turn received his orders from the yard technician.[3] Nichols volunteered and became qualified to put his name on the list of rotating temporary lead workers. His name came up to serve in that position for a two-month period beginning on December 28, 2007.

---

[3] This describes how the chain of command in the yard worked in practice. *E.g.,* R. 137-7 at 97, 103. Under the formal chain of command, however, all highway maintainers including the lead workers reported directly to the yard technician, who was considered their immediate supervisor.

Nichols believes that his problems at work began in December 2007 because "someone" at the Harvey Yard "did not want [him] to be the acting lead worker." R. 137-20 at 5. Nichols claims that although he was acting lead worker from December 28, 2007 through February 28, 2008, Martin, Romanski, Thompson, and Reynolds refused to treat him as such. Among other things, he claims that (1) he was made to do highway maintainer work while workers who he was supposed to be supervising were "sitting" back at the yard; (2) efforts were made to procure false accusations against him; and (3) he was required to always be on the road with his crew, while other acting lead workers did not go out on the road, and if they did they got to take the supervisor's truck and ride by themselves. *Id.* Nichols also claims that he was suddenly being called out for rule infractions while similar or worse rule infractions of other workers were ignored. In particular, Nichols complains about a one-day suspension he received without pay for violating IDOT's "Snow and Ice Policy" on February 5, 2008. R. 137-13 at 3; R. 137-14 at 2.

## B. Nichols's Grievances

Rather than attempt to summarize the contents of Nichols's grievances, the Court will set them out in full.

Nichols's first grievance challenged his citation for violating the snow and ice policy. Nichols also addressed his belief that he was being treated unfairly as acting lead worker. On March 10, 2008, Nichols filed a grievance with Martin stating as follows:

> A meeting took place in Your office approximately one month ago. At that meeting were: You, your Lead Lead

Worker Frank Romanski, your Lead Worker, Kevin Reynolds, and myself. We had a discussion concerning what problems "they" had with the way I do my job. Your Lead Lead Worker and your Lead Worker left that office with a "bad taste" in their mouths. I have heard it said by your Lead Worker: I know who to talk to in order to "get things done". I don't know what this means to you, but it sounds like "GANGSTER TALK" to me. That's not a problem for me. I am "very familiar" with this kind of "talk". Since then, I am witnessing an outright attempt by these two individuals (with the help of others) to "push me out". Literally. I am currently facing "discipline" due to "willful negligence" by these two individuals.

The grievance. On the night I was supposedly a "no-answer" [violation of snow and ice policy], I called the team section TWICE that night in LESS THAN TEN MINUTES. NO ONE ANSWERED THE PHONE. I continued to call. No one answers [sic] the phone until AFTER six O'clock, only to tell me I was "passed over". I can and will prove this allegation. I will also prove the "PROCEDURES" ARE NOT APPLIED EVENLY ACROSS THE BOARD. Why would they NOT answer the phone? Possibly because they were TOO EAGER to "got to the next person". These "despots" are so hell-fired to "get me". You (George) were asked by me to "get these people off my back". Now I am asking you, openly and formally. GET YOUR LEAD LEAD WORKER AND YOUR LEAD WORKER OFF MY BACK. It is WRONG for "THEM" to "DICTATE POLICY" onto me WHILE "THEY" commit every "administrative atrocity" on the "book".

"ASSALAAMALAIKUM"

D. NICHOLS

R. 137-9 at 3.

Nichols's second grievance was addressed to IDOT's policy requiring workers to rotate weekly between day and night shifts during the snow and ice season. *See* R. 137-7 at 130-31. Nichols's wife was suffering from a debilitating illness, and Nichols was needed at home during the evenings to care for her. Nichols requested to

be relieved from the rotation policy. On March 10, 2008, he filed a grievance stating as follows:

> A serious medical condition within my household requires I remain on the day shift for the duration of the snow & ice season—This medical condition, combined with willful negligence by the "office" is making the job a very difficult, yet stressful one.
>
> A "prompt" reply is appreciated. Before next week if possible.

R. 137-10 at 2.

Nichols's third grievance requested a religious accommodation to pray. According to Nichols, one of the tenets of his Islamic faith is that, when a person is faced with troubles in his life, he should pray more frequently. Nichols was finding it difficult to pray while serving as acting lead worker. Therefore, on March 10, 2008, Nichols filed a grievance stating as follows:

> I am a man of the Islamic faith—Have been a Muslim my Entire Life. It is a must for every Muslim to pray five (5) times a day. The hours spent on the road disallows time for at least 2 prayer sessions. I would appreciate if arrangements could be made for me to practice my religion in the proper manner.

R. 137-11 at 2.

All three of Nichols's grievances were denied at the step 1 level[4] on March 13, 2008. In each instance, the denial was signed by James Stumpner, Martin's

___

[4] It appears from the grievance documents included in the record that IDOT's grievance process involved four steps. First there is an attempt by the grievant's supervisor to resolve the matter (step 1), followed by an attempt to resolve the matter by the next higher level supervisor (step 2), followed by (or possibly in the alternative) an attempt to resolve it by the manager ("where applicable") (step 2a),

supervisor twice removed. Three days later, on March 13, 2008, all three grievances were denied at the step 2 level by someone with the initials "MS." "MS" likely stands for Mike Schivarelli, Martin's supervisor once removed.[5] On March 20, 2008, all three grievances were denied at the step 2a level by Carmen Iacullo. The record does not indicate any action on Nichols's three grievances beyond the step 2a level.[6]

### C. Nichols Seeks Help From Employee Assistance/Labor Relations

Although the timeline of events is not clearly established by the current record, it is reasonable to infer from the documents submitted to the Court that, shortly after Nichols filed these grievances, he became aware of increasing talk at the yard about someone wanting to hurt him. He previously had heard "certain 'tough guy' talk around the yard" that "you don't want to piss this guy off" because "he can do this—he can do that—he can have your legs broken." R. 137-22 at 3. Nichols

---

followed by an attempt to resolve it by the agency head (step 3). A review and final determination is made by the Director of CMS (step 4). *See, e.g.,* R. 137-9 at 2.

[5] Nichols's chain of command was as follows: Nichols reported to Martin (Yard Technician), who reported to Tricia Robinson (Area Manager), who reported to Schivarelli (Director of Operations), who reported to Stumpner (Bureau Chief of Maintenance), who reported to Carmen Iacullo (Assistant to the Region One Engineer), who reported to Diane O'Keefe (Deputy Director of Highways, Region One Engineer). One explanation for why Schivarelli may have acted on Nichols's grievances at a level above Stumpner (Schivarelli's superior) is that, according to Nichols's testimony, Martin (Nichols's direct supervisor and the supervisor who likely should have signed the grievances at the step 1 level ) ignored Nichols when Nichols tried to give him the grievances. As a result, Nichols states, he delivered his grievances to Stumpner instead.

[6] Apparently, Nichols was placed on administrative leave before any further steps in the grievance process could occur. R. 152 at 11 (¶ 42). An undated notation on Nichols's grievance requesting an accommodation to pray states that it ultimately was withdrawn by the union.

believed these statements referred to Romanski. Initially, Nichols claims, he dismissed comments such as this as 'idle chatter.'" *Id.* But during the time period he was acting lead worker, he was "sitting in a truck out in the bays" when he heard "a voice say—the guy is going to get himself 'fucked up.'" *Id.* Nichols believed this statement was made about him. Later, on March 28, 2008, one of Nichols's co-workers told him that "[Reynolds] is saying if you don't stop what you're doing, you are going to get 'fucked up.'" *Id.* Nichols believed these threats were being made against him because he had been complaining about being treated unfairly while serving as acting lead worker and calling attention to the ways in which the lead workers, the lead lead worker, and the yard technician were misapplying the rules and policies of IDOT. Frustrated and distraught over these threats, Nichols called the Employee Assistance Program ("EAP") in Springfield. The person with whom he spoke (Donna Kohlberg), however, did not know how to handle the problem and forwarded his call to the Labor Relations office in Springfield. *Id.* The person with whom Nichols spoke at the Labor Relations office ("Julie") told Nichols to "go to [his] supervisors." Nichols replied that "the problem is with [his] supervisors." *Id.* The person from the Labor Relations office responded that her department does not "talk directly to the workers," and apparently terminated the call. *Id.*

A few days later, on April 1, 2008, Nichols had a medical emergency with his wife, and rushed to get to work on time. He states that he arrived within the thirty minutes grace period accorded to workers under department policies, but that Martin already had pulled the sign-in sheet and refused to let him work. Nichols says that

when he complained about the incident to Giavanni Fulgenzi, District Personnel Manager, Martin lied to Fulgenzi about what time he had arrived.[7]

### D. Nichols Sends The Fax That Caused Him To Be Fired

On April 2, 2008, the day after Martin sent Nichols home after arriving late to work, Nichols was again at home, this time serving the one-day suspension he previously had received for violating the snow and ice policy. Nichols states that he was "very frustrated—so much so [he] felt [he] was going to do whatever [he] could to get their attention." R. 137-22 at 4. That day, Nichols sent a fax both to EAP and to the Labor Relations Department, stating the following:

> Attention: Julie or Terry Redman
>
> From Demarco Nichols
>
> The E.A.P. suggested I write this letter to you, Labor Relations. Obviously, they didn't think this was "worthwhile". There is a problem between myself and the "supervision" at the Harvey Team Section. This supervision has "singled" me out as some sort of disciplinary "project". I was "judged" the moment I set foot in this team section. They are trying to make an "example of me" to show others what they should not do. To scare them into "playing the game". To show how far-reaching their "power" goes. This supervision includes George Martin (technician), Frank Romanski (Lead Lead Worker), Robert Thompson Jr. (Lead Worker) and Kevin Reynolds (Lead Worker). I was Acting Lead Worker from 12-28-08 to 2-28-08. Before this two-month period, I had been at this team section 5 ½ years. WITHOUT A PROBLEM. The problems began because "someone" in that "office" DID NOT WANT ME TO BE THE ACTING LEAD WORKER. While I was Acting Lead Worker, I was accused of SLEEPING IN THE TRUCK BY THE "OFFICE". EVERY TIME I WENT ON THE ROAD, I

---

[7] *See* R. 137-24 at 3 ("[Martin] LIED . . . about what time I arrived at work. This was done out of 'hostility'. 'I'm not letting you work, and there is NOTHING you can do about it'.").

was made to take "someone" with me. The Acting Lead Worker after me, Mark Edwards, ALWAYS GOES ALONE. I GET THE FEELING I CAN'T BE TRUSTED. IN FACT, NO OTHER LEAD WORKER TAKES ANYONE ON THE ROAD WITH THEM. There are thirteen rooms in that team section. In the 5+ years I have been there, I have been allowed in SIX (6), while the "others" have full run of the place.

While I was Acting Lead Worker, I was made to do H.M. work (highway maintainer) while there were "insubordinates" (H.M.'s) sitting in chairs, never to go on the road. I have had the Lead Lead Worker (Frank Romanski) call the yard at 3:00 a.m. His shift did not start until 6:30 a.m. When he saw I was there for a callout, HE WOKE UP HIS SUBORDINATE, HAD HIM GET OUT OF HIS BED, THEN COME TO THE YARD (3:45 A.M.) TO "SEE" WHAT I WAS DOING! While I was Acting Lead Worker, I was made to plow snow while an insubordinate, (H.M.) was allowed to sit in the "office". While I was Acting Lead Worker, I was marked "A.W.O.L." without ample show-up time while the "others" are allowed to take as long as they need, or stay home. While I was Acting Lead Worker, I was referred to Schaumburg for "discipline". By the time you get this, I will be serving a suspension.

I have heard a lot of "TOUGH-GUY TALK" in the last three months. I filed a grievance with the "Technician" George Martin, asking him to "GET HIS LEAD WORKERS OFF MY BACK" (SEE PAGES 2&3). Since the grievance, I have heard one of the Lead Workers, Kevin Reynolds, saying: De Marco is going to mess around and get himself "fucked up". What do you think this means? I think it means "SOMEONE" wants me physically hurt. I am capable of protecting myself. And WILLING, if the threat persists, to do away with it by ANY AND ALL NECESSARY MEANS. Am I "hostile"? No. THE QUR'AN TEACHES PEACE. Am I capable of "hostility"? Yes. INFINITE hostility. Just yesterday, I had a family emergency. When I came in late, the "tech" sent me home. If there is another incident of this nature, someone in the Harvey yard is going to get "fucked up". YOU HAVE BEEN TOLD: These men are trying to act like "mobsters". These men are trying to say they "know people". Well[,] so do I.

"AS TO LIFE, ALLAH GAVE IT." "A COWARD IS NOT LIKELY TO SAVE IT[.]".

"ASSALAAMALAIKUM"

DE MARCO NICHOLS

R. 137-15 at 5-6.

### E.    IDOT Suspends Nichols Following Receipt of the Fax

On April 3, 2008, the Labor Relations office forwarded Nichols's fax to Fulgenzi. This was the same day that Nichols returned to work after serving his one-day suspension for the ice and snow policy rule infraction. Nichols states that, "as soon as [he] got to the job site, th[e] same co-worker approached [him] again" and said "they're saying you've got to stop what you're doing, or you're going to get 'fucked up.'" R. 137-22 at 4. Later that day, Nichols received a faxed letter under the typed name of Iacullo's superior, Diane O'Keefe, but signed by Fulgenzi. The letter advised Nichols that he was being placed on paid administrative leave as of the close of business that day. R. 137-19 at 2.

The next day, Nichols received a second letter under O'Keefe's name, also signed by Fulgenzi, directing him to attend a pre-disciplinary meeting on April 10, 2008, which was "being held to discuss your alleged **threat of violence in the workplace.**" R. 137-20 at 2. Enclosed with the letter was a Statement of Charges indicating that Nichols was being charged with an infraction of IDOT's rule against "Threat of Violence in the Workplace," *id.* at 3, which states as follows:

> Violence in the Workplace. The use of violence or the threat of the use of violence by Department employees to subordinates, co-workers, superiors or others will not be tolerated. No employee may physically use or threaten to use any object to harm another individual. All employees

11

> have the responsibility to promptly and completely report
> any actions of violence or the threat of violence, to the
> appropriate management personnel.

R. 137-27 at 79. A third letter in O'Keefe's name and signed by Fulgenzi informed

Nichols that "in compliance with Departmental Policies" a state-ordered medical

examination had been scheduled for him. R. 137-21 at 2.

The pre-disciplinary meeting was held on April 10, 2008. In attendance were

Nichols, Fulgenzi, Schivarelli, Martin, and Nichols's union representative, Mike

Melone. R. 137-16 at 2. Melone spoke on Nichols behalf, stating the following:

> On the day in question, a co-worker told [Nichols] of an
> alleged threat against him so he called Springfield and
> spoke to Donna Kohlberg who transferred him to Labor
> Relations where he faxed his statement. They didn't know
> that he felt threatened and that's why he wrote what he
> did. However, he has prepared a statement which he
> brought with [him] today.

*Id.* Nichols's statement said that he had "tried to report that [he] was being

threatened to EAP Springfield" but that "[he] was blown off," and that he "put

[himself] in a 'real' EAP on Monday." *Id.* Not satisfied with this explanation, Fulgenzi

directed Nichols to provide an additional rebuttal in which he was to explain each of

the specific statements in the fax which Fulgenzi identified to him as being in

violation of IDOT's policy against violence in the workplace. *Id.* at 3.

**F.** **Nichols Provides A Supplemental Statement Explaining The "Threatening" Statements In His Fax**

Nichols provided his supplemental statement to Fulgenzi on or about April 21, 2008. *See* R. 137-24 at 2-4. Nichols's supplemental statement claimed that Fulgenzi had "picked apart [his fax] to show a 'problem' on MY PART," and noted that "this fax was sent ONLY AFTER YOUR EMPLOYEE ASSISTANCE UNIT, AND YOUR LABOR RELATIONS OFFICE REFUSED TO DEAL WITH THE PROBLEM." *Id.* at 3. Nichols then attempted to respond to the "parts" of his fax that Fulgenzi had "'picked' out of the last paragraph." *Id.*

Nichols explained that the statement he was "capable of protecting [himself]" meant that he has "spent the better years of my life as a dilligent [sic] practitioner of boxing, and the martial arts. (SELF DEFENSE)." *Id.* The statement that he was "willing, if the threat persists, to do away with it by any and all necessary means," referred to "a natural instinct. No one wants to live in a hostile environment." *Id.* Nichols wrote that the statement "Am I capable of hostility? yes. Infinite hostility," was "made to show that [he was] 'HUMAN'. If a person was made to work in the type of environment [he was] forced to work in, his hostility would become 'infinite.'" *Id.* Nichols pointed out that he had heard "on THREE (3) OCCASIONS how [he] [was] going to get 'fucked up.'" *Id.* He also pointed out that focusing solely on the statement that he was "capable of [infinite] hostility" ignores the sentence immediately before that sentence, which stated he was *not* hostile ("Am I hostile? No. The Qur'an teaches 'PEACE'"). That focus also ignores, he said, the fact that he actually took a peaceful approach to his work problems when he "called Springfield for help." *Id.* Yet after

taking this peaceful approach *and* peacefully serving a one-day suspension for a rule infraction he believed was manufactured against him, he still was met upon return to work with another threat that he was going to be "fucked up." *Id.*

Finally, Nichols explained that the statement "if there is another incident of this nature, someone at the Harvey yard is going to get 'fucked up'" was "made out of sheer frustration, and born of the fact [he] tried to present [his] problem to the appropriate office (Springfield Employee Assistance Unit and Labor Relations (3-28-08)) but they wanted nothing to do with it. The fax was sent with the hope they would be more 'attentive' to the PROBLEMS [he] was having with [his] supervisors." *Id.* Nichols closed by explaining the last line of his fax: 'As to life, Allah gave it' 'A coward is not likely to save it.'" This sentence meant: "Life is given by God. No man should be 'AFRAID' to defend himself." *Id.*

### G.    IDOT Terminates Nichols

The formal decision to discharge Nichols was made sometime before May 9, 2008, when a letter was prepared in O'Keefe's name and signed by Fulgenzi informing Nichols he was being "suspended up to 30 days pending decision to discharge." R. 137-25 at 2. IDOT claims that the decision to suspend Nichols pending decision to discharge was the result of a determination that Nichols's fax contained a "straight[-]forward threat of violence" in violation of IDOT's "zero tolerance policy." R. 137 at 9 (¶ 68). IDOT states that Fulgenzi and Stumpner were the ones who

recommended that Nichols be discharged. R. 137 at 9 (¶ 69).[8] This recommendation

was made to Iacullo. *Id.; see also* R. 137-5 at 16 (Iacullo Dep. 15). Fulgenzi testified

that he concluded that termination was appropriate after consultation with:

(1) Nichols's chain of command, (2) Charles Klemz, Fulgenzi's supervisor in the

Personnel Department, and (3) the Labor Relations Office (either the head of that

office, T. Redman, or someone on his staff). *See* R. 136-6 at 47-48 (Fulgenzi Dep. 46-

47). Fulgenzi's recommendation to discharge was based on his discussions with these

individuals as well as on "the outcome of the pre-disciplinary hearing" and Nichols's

"response to the charges." *Id.* at 47 (Fulgenzi Dep. 46). After speaking with Fulgenzi

and Stumpner about their recommendation, Iacullo concurred with it. R. 137-5 at 17

(Iacullo Dep. 16). Iacullo likely then conferred with Klemz about the

recommendation, and then either he or Klemz would have been the one to bring the

recommendation to O'Keefe. *Id.* at 20-21 (Iacullo Dep. 19-20). O'Keefe concurred in

the recommendation, and then Fulgenzi passed it on to IDOT's Central Office in

Springfield on O'Keefe's behalf. R. 137 at 9 (¶ 69). The final step in the discharge

process was CMS's approval of Nichols's termination and service of discharge papers

on him. *Id.* (¶ 70).[9] The discharge papers, dated May 20, 2008, indicate that Nichols

was terminated for cause effective June 4, 2008. R. 137-26 at 2.

---

[8] Stumpner testified he did not recall whether he was involved in the decision to terminate Nichols. R. 149-6 at 10 (Stumpner Dep. 47).

[9] Some of the deposition testimony (Fulgenzi and Iacullo) stressed that ultimately it was CMS's decision to terminate Nichols. But as noted in an earlier footnote, IDOT has stipulated that the decision to terminate Nichols was made by IDOT, not CMS. The Court concludes therefore that IDOT's decision to discharge Nichols officially was made on May 9, 2006, when the letter notifying Nichols that he was being

### H.  Post-Discharge Proceedings

The union filed a grievance on Nichols behalf on June 8, 2008. R. 137-31 at 2. Nichols filed a charge of discrimination with the EEOC on June 24, 2008. R. 137-32. The union stated in its grievance that Nichols "was subject to an uncomfortable work environment with co-workers that was brought to the attention of management." R. 137-31 at 3. The union's position was that "the incident [of alleged threat of violence in the workplace] was over exaggerated and there was no intent of violence." *Id*. On July 8, 2008, Schivarelli signed off on a Step 2 and Step 2a denial of Nichols's grievance. *Id*. at 2. A grievance hearing was scheduled to take place on July 11, 2008. At the start of the hearing, however, Nichols was told for the first time that in order to proceed with the grievance he would have to withdraw his EEOC charge. Nichols declined to do so, and therefore the grievance hearing was not held. *See* R. 149-3 at 6 (Nichols Affidavit, ¶¶ 25-26). A notation on the grievance form dated July 22, 2008 indicates that the union later withdrew Nichols's grievance. R. 137-31 at 2.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To

---

suspended pending decision to discharge was prepared and forwarded by Fulgenzi to CMS for final action.

defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## DISCUSSION

### I.

### IDOT's Motion To Strike The William's Affidavit.

As an initial matter, the Court will address IDOT's oral motion to strike the Williams Affidavit. At the hearing held on IDOT's motion for summary judgment, counsel for IDOT orally moved to strike one of the affidavits submitted by Nichols in opposition to IDOT's summary judgment motion on the ground that the witness, Robert Williams, was not listed in Nichols's Rule 26(a) initial disclosures. Counsel for IDOT pointed out that the Court granted Nichols's motion to strike the Romanski Affidavit (R. 162) for this very reason, and argued that the same ruling should be applied to the Williams Affidavit. Plaintiff's counsel replied that Nichols in fact did disclose Williams as a witness having knowledge of contested issues, but that he did so in his answers to IDOT's interrogatories rather in his initial disclosures.

The Court disagrees with IDOT that Nichols's failure to disclose Williams is the equivalent of IDOT's failure to disclose Romanski. If in fact Nichols disclosed Williams in his interrogatory answers, his failure to disclose Williams in his initial disclosures was harmless. Ultimately IDOT received notice that Nichols might rely on Williams as a witness having knowledge of relevant facts prior to the summary

judgment briefing. In contrast, IDOT never disclosed Romanski as having relevant knowledge prior to submitting his affidavit in support of summary judgment. Counsel for IDOT informed the Court at oral argument that she could not speak to whether Williams in fact was disclosed in Nichols's interrogatory responses. Because IDOT has not contested otherwise, the Court will rely on the representation of Plaintiff's counsel that Williams was disclosed in Nichols's interrogatory answers. In any event, however, since Nichols also submitted the affidavits of several other individuals whose testimony was similar to Williams' testimony, even if the Court were to strike the Williams Affidavit, that would not have any effect on the outcome of IDOT's motion for summary judgment.[10]

## II.

## Summary Judgment

It appears from the amended complaint that Nichols is alleging that IDOT is liable under Title VII for failing to accommodate his religious practices, for discriminating against him based on his religion, and for retaliating against him based on his engagement in statutorily protected activities. The Court will discuss IDOT's motion for summary judgment on each of these claims in turn.

---

[10] The Court has reviewed the Romanski Affidavit and similarly concludes that the Court's ruling striking that affidavit did not have any effect on the outcome of IDOT's motion for summary judgment. Moreover, in striking the Romanski Affidavit, the Court indicated that Romanski's testimony would not barred at trial. However, the Court granted Nichols leave to take Romanski's pre-trial deposition if he chooses to do so.

## A.    Failure to Accommodate

Title VII prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e–2(a)(1). Title VII defines "religion" as "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to [sic] an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). "The statutory definition of 'religion' in Title VII is drafted as an unusual blend. It combines a broad substantive definition of religion with an implied duty to accommodate employees' religions and an explicit affirmative defense for failure-to-accommodate claims if the accommodation would impose an undue hardship on the employer." *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 448 (7th Cir. 2013). The Seventh Circuit has said that, to establish a prima facie case of religious discrimination based on an employer's failure to provide reasonable accommodation, "a plaintiff must show that the observance or practice conflicting with an employment requirement is religious in nature, that [he] called the religious observance or practice to [his] employer's attention, and that the religious observance or practice was the basis for [his] discharge or other discriminatory treatment." *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1575 (7th Cir. 1996) (citations omitted). "[O]nce the plaintiff has established a prima facie case of discrimination, the burden shifts to the employer to make a reasonable accommodation of the

religious practice or to show that any accommodation would result in undue hardship." *Id.*

### 1. Prima Facie Case

IDOT argues that Nichols has failed to establish any of the three elements of a prima facie case of failure to accommodate. First, IDOT argues that Nichols's stated religious practice—prayer in a quiet place—did not conflict with his job duties as a Highway Maintainer. R. 136 at 14. Nichols testified that it takes him approximately seven minutes to pray, and that a normal work break provided a sufficient length of time to pray. Nichols was afforded three work breaks—morning, afternoon, and lunch. Nichols testified that he had worked for IDOT for approximately ten years, and that, in the past, he had been able to pray during his breaks. Therefore, IDOT concludes, Nichols's religious practices did not conflict with his employment requirements.

IDOT's argument ignores that Nichols also testified that, although he previously had found sufficient time to pray during his breaks, in early 2008 he felt he needed to pray more frequently because of the stress he was experiencing while serving as acting lead worker. In addition, because the conditions of his job had changed, he could no longer pray during the same times or in the same places as he had before. Nichols testified that prayer on the road while he was acting lead worker was impossible because his supervisors always required him to have other workers in his truck. Nichols stated that ideally he wanted permission to return to the yard for brief periods during the day to pray in a quiet place alone. The Court finds that this

testimony creates a disputed issue of fact as to whether Nichols's need to pray during the workday in 2008 while he was acting as temporary lead worker conflicted with his job requirements in that position.

Second, IDOT argues that Nichols failed to properly notify IDOT of his religious requirements because he never specifically told his supervisors that in order to properly pray during the workday he needed to be alone in a quiet place and that he would prefer to return to the yard once or twice a day as the best means by which he could accomplish praying in the proper manner. *See* R. 136 at 14. IDOT misperceives the notice requirement. As the Seventh Circuit has explained, Title VII does not "require adherence to a rigid script[.]" *Adeyeye,* 721 F.3d at 450. Rather, "Title VII, like the Americans with Disabilities Act [ADA], was written to deal with real communications between employees and managers, and the law expects both to be reasonable." *Id.* The employee's request satisfies the notice requirement if it is sufficient "to alert the employer to the fact that the request is motivated by a religious belief." *Id.* Nichols's grievance stated that "the hours spent on the road disallows time for at least 2 prayer sessions," and that he "would appreciate if arrangements could be made for [him] to practice [his] religion in the proper manner." R. 137-11 at 2. These statements clearly alerted IDOT that Nichols's grievance was motivated by a religious belief. If IDOT was not certain about the manner in which "the hours [Nichols] spent on the road" prevented him from being

able to pray at least twice a day, then it had the duty to communicate with Nichols to clarify the nature of his request.[11]

Finally, IDOT argues that Nichols has failed to establish the last requirement of a prima facie religious accommodation case because there is no evidence in the record to suggest that the religious observance or practice in question was the basis for Nichols's discharge. The last requirement of a prima facie case presents somewhat of a problem, which neither party has squarely addressed. As previously noted, the formulation most frequently cited by the Seventh Circuit for the last requirement of a prima facie case is that the plaintiff must show that the religious observance or practice was the basis for the plaintiff's "discharge or other discriminatory treatment." *Ilona of Hungary, Inc.*, 108 F.3d at 1575. But Seventh Circuit case law gives very little guidance as to what the term "discharge or other discriminatory treatment" means. On the one hand, the concept might be the same as the term "adverse employment action," as interpreted and applied in Title VII disparate treatment cases. Indeed, some of the cases in this circuit do use the term "adverse employment action" in place of the term "discharge or other discriminatory treatment" for the third prerequisite to a plaintiff's prima facie religious

___

[11] *See Adeyeye*, 721 F.3d at 450 (if employee's request for accommodation is not certain, managers should ask employee to clarify the nature of his request); *Porter v. City of Chicago,* 700 F.3d 944, 953 (7th Cir. 2012) ("In requiring employers to 'offer reasonable accommodations,' we have encouraged 'bilateral cooperation' between the employee and employer and recognized that employers must engage in a dialogue with an employee seeking an accommodation.") (citation omitted); *Xodus v. Wackenhut Corp.*, 619 F.3d 683, 686 (7th Cir. 2010) (when presented with a request for a religious accommodation, "an employer cannot shield itself from liability by . . . intentionally remaining in the dark") (internal quotation marks and citation omitted).

accommodation case. *See, e.g., Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 478 n. 2 (7th Cir. 2001) (citing *EEOC v. United Parcel Serv.*, 94 F.3d 314, 317 (7th Cir. 1996)). But these cases appear to invoke the adverse employment action requirement without consciously considering whether that term is appropriate in the context of a religious failure to accommodate case. Since such cases generally deal with obvious adverse employment actions—*e.g., Adeyeye*, 721 F.3d at 447 (termination); *Xodus*, 619 F.3d at 684 (refusal to hire)—they cannot be said to stand for the proposition that an adverse employment action is required. *See Stanek v. St. Charles Cmty. Unit Sch. Dist. No. 303*, 783 F.3d 634, 640 (7th Cir. 2015) ("unexamined assumptions of prior cases do not control the disposition of a contested issue").

Several other circuits have held that an adverse employment action is required in a religious failure to accommodate case, although it is not entirely clear whether those circuits ascribe the same meaning to that term as does the Seventh Circuit.[12] Cases within this circuit at the district court level are somewhat mixed. *Compare Rodriguez v. City of Chicago,* 1996 WL 22964, at *3 (N.D. Ill. Jan. 12, 1996) (applying the Ninth Circuit standard that requires either an adverse employment action or a

---

[12] *See, e.g., Ellis v. Principi,* 246 Fed. App'x 867, 872 (5th Cir. 2007) (the employee must show that he "was discharged or disciplined for failing to comply with the conflicting employment requirement"); *Goldmeier v. Allstate Ins. Co.*, 337 F.3d 629, 637 (6th Cir. 2003) (same); *Ali v. Alamo Rent-A-Car, Inc.,* 8 Fed. App'x 156, 158-59 (4th Cir. 2001) (dismissing failure to accommodate claim due to absence of adverse employment action where employee alleged she was transferred to a different job position based on her religious beliefs); *see also Heller v. EBB Auto Co.,* 8 F.3d 1433, 1438 (9th Cir. 1993) (employee must show he was either subjected "to discriminatory treatment, including discharge, because of his inability to fulfill the job requirements" or else threatened with same) (emphasis added).

threat of one), *with Williams v. U.S. Steel Corp.*, 40 F. Supp. 3d 1055, 1064 (N.D. Ind. 2014) (holding that adverse employment action in the disparate treatment sense is required).

While not discussing the issue, the Seventh Circuit's opinion in *Porter*, 700 F.3d 944, suggests that an adverse employment action is not required in a religious failure to accommodate case. There the court based its affirmance of the district court's denial of the plaintiff's failure to accommodate claim on a finding that the employer had offered a reasonable accommodation. But the court also affirmed the district court's denial of the plaintiff's disparate treatment claim, doing so based on a finding that the plaintiff had not alleged an adverse employment action. If an adverse employment action was required for the religious accommodation claim as well as for the religious disparate treatment claim, then presumably the court would not have had to reach the issue of whether the employer's accommodation of the plaintiff's religious beliefs was reasonable.

Also lending support to the argument that an adverse employment action is not required in a religious failure to accommodate case is the Seventh Circuit's jurisprudence under the ADA. The Seventh Circuit generally applies similar standards in religious failure to accommodate cases and disability failure to accommodate cases. *E.g., Adeyeye,* 721 F.3d at 450. Whereas the Seventh Circuit requires an adverse employment action for a disparate treatment claim under the ADA, it does not impose the same requirement in the context of a failure to accommodate claim under the ADA. Instead, to survive summary judgment on a

failure to accommodate claim under the ADA, the third element of a plaintiff's prima facie case requires the plaintiff to point to evidence that, if believed by a jury, would demonstrate only that "his employer failed to reasonably accommodate that disability." *Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 701 (7th Cir. 2014). It makes sense, therefore, that proof that an employer failed to accommodate a conflicting religious practice in circumstances where an accommodation would not impose an undue burden also would be sufficient in and of itself to support a religious failure to accommodate claim, without the necessity of the employee showing that he also suffered some separate adverse employment action as that term is used in disparate treatment cases.[13] Logically, it also makes sense as the injury in a failure to accommodate is the inability to practice one's religion that occurs immediately, not later when there may be some possibly related job action.

If an adverse employment action is required for Nichols to establish a prima facie religious failure to accommodate claim, then perhaps he has satisfied that requirement by IDOT's termination of his employment. IDOT argues, however, that it terminated Nichols's employment for a legitimate, nondiscriminatory reason, namely that he violated IDOT's policy against workplace violence. Of course, Nichols

---

[13] *See Lawson v. Washington*, 319 F.3d 498, 500 (9th Cir. 2003) (Berzon, J., dissenting from denial of rehearing en banc) ("accommodation is a statutory obligation and [therefore] failing to accommodate is itself an unlawful employment practice, without regard to whether another employment consequence, other than the failure to accommodate, is visited upon the employee"); *see also Nawrot v. CPC Int'l*, 259 F. Supp. 2d 716, 724 (N.D. Ill. 2003) (holding that the ADA does not require a separate adverse employment action to state a failure to accommodate, and stating in dicta that this holding was justified by the parallel rule under Title VII religion cases that "plaintiffs are not required to prove adverse employment actions to state a claim").

challenges IDOT's reason for his termination as pretext for discrimination against him because he is Muslim. But even if Nichols were to succeed on this disparate treatment claim, IDOT still argues that the evidence is insufficient to show that Nichols was terminated "because of a conflict with his need to pray while at work" (presumably as distinguished from "because of his status as a Muslim").

Notwithstanding IDOT's argument, IDOT's summary judgment papers simply assume that an adverse employment action is required without any analysis of that issue. The Court therefore finds either that an adverse employment action separate from IDOT's failure to accommodate is not required, or that the evidence is disputed as to whether IDOT's termination of Nichols's employment was motivated in part by his request for a religious accommodation.[14] Should it later be determined that the evidence is insufficient to support a connection between Nichols's religious need to pray at work and IDOT's termination of Nichols's employment, then it may become necessary for the Court to make a definitive ruling on whether Nichols must establish some other employment action taken against him because of a conflict with his religious practice of prayer. The parties will be asked at that time to submit additional briefing papers setting out their reasoned and legally supported analysis of that issue.

---

[14] On the latter point, the Court notes that one of Nichols's co-workers testified that he has heard Romanski complain about Nichols requesting an accommodation to pray and state "why does he want special privileges to pray." R. 150-15 (Williams Affidavit, ¶ 5). When Romanski made these comments, Martin also was present. *Id.*, ¶ 6.

## 2. Undue Hardship

Assuming that Nichols can establish a prima facie case for his failure to accommodate claim, the next issue is whether IDOT either offered him a reasonable accommodation or else can establish undue hardship. IDOT admits it did not offer Nichols any accommodation for his request to pray. Instead, IDOT argues it was not required to offer Nichols any religious accommodation because it can show undue hardship. Undue hardship exists when a religious accommodation would cause "more than minimal hardship to the employer or other employees." *Endres v. Ind. State Police*, 349 F.3d 922, 925 (7th Cir. 2003). "[A]n accommodation that requires other employees to assume a disproportionate workload (or divert them from their regular work) is an undue hardship as a matter of law." *Noesen v. Medical Staffing Network, Inc.*, 232 Fed. App'x 581, 584-85 (7th Cir. 2007). IDOT argues that accommodating Nichols's prayer request would impose more than minimal hardship on both IDOT and other IDOT employees because it would be operationally prohibitive for IDOT to allow Nichols to leave his work location on the road to return to the yard at least twice a day. According to IDOT, allowing Nichols to return to the yard would put a scheduling strain on IDOT and result in extra costs and disruptions to the entire work crew. *See* R. 136 at 16.

IDOT relies on the conclusory assertions of its management personnel to the effect that it would be an undue hardship on IDOT to allow Nichols to return to the yard twice a day to pray. The individuals who make this assertion, however, do not provide any concrete factual support for it. Moreover, the conclusory assertions of

management personnel are contradicted by Nichols, who states by affidavit that the work site is always within a few miles of the yard and that IDOT has never required a lead worker to stay on the road with his crew at all times.[15] According to Nichols, he is the only lead worker that IDOT has required to stay with his crew throughout the entire day, and IDOT could have accommodated his prayer request simply by allowing him to do what every other lead worker before and after him has done.[16] The testimony of one of Nichols's co-workers supports Nichols's testimony.[17] This evidence is sufficient to create a disputed issue of fact on the question of undue hardship. *See Minkus v. Metro. Sanitary Dist. of Greater Chi.*, 600 F.2d 80, 81 (7th Cir. 1979) ("whether an employer can reasonably accommodate a person's religious

---

[15] *See, e.g.,* R. 149-3 at 5 (Nichols Affidavit, ¶ 30) ("Based upon my 10 years of experience with working with IDOT lead worker's (LW's) temporary and permanent, daily or almost daily and throughout the day would leave their crew and take their truck to drive to other job sites, the yard or for other reasons."); *id.,* ¶ 20 ("During my 10 years with IDOT, . . . I witnessed IDOT allowing other LW's to be alone in their truck and to go where they wished alone in their truck, including during the lunch break.").

[16] *See* R. 149-3 at 7 (Nichols Affidavit, ¶ 29) ("Had IDOT provided me with a religious accommodation, it would not have required to take the whole crew with me to the yard, provided that IDOT no longer required me to remain with the crew at all times. Indeed, based upon my experience of working with IDOT for 10 years, IDOT did not require any other lead worker before or after me to remain with the crew at all times. IDOT only required this of me.").

[17] *See* R. 149-1 at 4 (Love Affidavit #1, ¶ 30) (acting lead worker typically has his own separate truck); R. 149-2 at 1 (Love Affidavit #2, ¶ 11) ("Some highway maintainers would remain at the job site during the morning breaks. Others would take a truck and drive somewhere during the morning break. Many trucks existed at the job site."); R. 149-2 at 1-2 (Love Affidavit #2, ¶¶ 12, 14) (Nichols could have driven to a quiet place and prayed alone during morning and afternoon breaks); R. 149-2 at 2-3 (Love Affidavit #2, ¶¶ 18-31) (both acting lead workers and highway maintainers frequently left the job site in a truck alone for short periods of time but Nichols was never allowed to do the same).

beliefs without undue hardship is basically a question of fact.") (internal quotation marks and citation omitted).

In addition to the above, a disputed issue of fact exists on the question of undue hardship because a reasonable jury could question IDOT's good faith in asserting undue hardship. IDOT's good faith is at issue because IDOT admits it never engaged in any dialogue with Nichols about his request for an accommodation. *See* R. 158 at 7.[18] The Seventh Circuit has said that, "[i]n addition to holding employees to their obligation to fully participate in the interactive process, our cases also demonstrate that if the employee has requested an appropriate accommodation, the employer *may not simply reject it* without offering other suggestions or at least expressing a willingness to continue discussing possible accommodations. This reflects the give-and-take aspect of the interactive process. An employer cannot sit

_____

[18] Nichols testified that he attempted to explain the circumstances of his prayer request to Martin but that Martin refused to engage in any conversation with him on the topic. R. 137-3 at 158. After Martin refused to acknowledge his verbal requests for an accommodation, Nichols prepared a written grievance and presented it to Martin. Although Martin was required to acknowledge and sign the grievance, he refused to do so. Martin denied having any knowledge of Nichols's request for a religious accommodation, and also denied refusing to sign Nichols's grievance. R. 137-7 at 48, 192. But on summary judgment, the Court is required to credit Nichols's version of what happened. Nichols also states that after Martin refused to acknowledge his grievance, he presented it to Stumpner at the pre-disciplinary hearing that was held to address Nichols's missed snow days infraction. There is no dispute that Stumpner considered Nichols's request for a quiet place to pray, and that he denied it. R. 137-11 at 2. Stumpner testified that neither he nor anyone of whom he was aware sought any clarification from Nichols about what would be required to accommodate Nichols's request that "arrangements . . . be made for [him] to practice [his] religion in the proper manner." R. 149-6 at 12 (Stumpner Dep. 60). Stumpner's testimony on this point was confirmed by Martin, R. 137-7 at 193-94, 206 (Martin Dep. 192-93, 205), and by Fulgenzi, R. 136-6 at 145-47 (Fulgenzi Dep. 144-46), both of whom also said they were not aware of anyone who investigated or spoke with Nichols about his prayer request.

29

behind a closed door and reject the employee's requests for accommodation without explaining why the requests have been rejected or offering alternatives." *E.E.O.C. v. Sears, Roebuck & Co.,* 417 F.3d 789, 806 (7th Cir. 2005) (emphasis added); *see also Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1062 (7th Cir. 2014) ("While an employer's failure to engage in the interactive process alone is not an independent basis for liability, it is actionable if it prevents identification of an appropriate accommodation for a qualified individual.") (internal quotation marks and citation omitted); *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996) ("A party that fails to communicate, by way of initiation or response, may . . . be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.").

IDOT "bears the burden of proof, so it must show, as a matter of law, that any and all accommodations would have imposed an undue hardship" on the conduct of its business. *Adeyeye,* 721 F.3d at 455. The proof submitted by IDOT in support of summary judgment on this issue is insufficient to warrant a finding as a matter of law in IDOT's favor. Accordingly, summary judgment in favor of IDOT on Nichols's failure to accommodate claim is denied.

## B. Disparate Treatment

To withstand summary judgment on a disparate treatment claim, a plaintiff must show that he suffered an adverse employment action and that the action was the product of discrimination. *Chaib v. Indiana*, 744 F.3d 974, 981 (7th Cir. 2014). There is no dispute that Nichols suffered an adverse employment action when he was

fired. The only question is whether he was fired because of his religion. [19]

"Under Title VII, a plaintiff can prove discrimination either by presenting evidence of discrimination (the 'direct method' of proof), or by the *McDonnell Douglas* burden-shifting approach (the 'indirect method')." *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 630 (7th Cir. 2009). Nichols argues he has met his burden of proof under either method. Examining the evidence under the direct method, the Court concludes that summary judgment is not appropriate on Nichols's disparate treatment claim. Therefore, the Court finds it unnecessary to address the parties' arguments with respect to the *McDonnell Douglas* indirect approach.

"Under the direct method of proof, a plaintiff's claim survives summary judgment if [ ]he can demonstrate triable issues as to whether discrimination motivated the adverse employment action." *Darchak,* 580 F.3d at 631 (internal quotation marks and citation omitted). "The focus of the direct method of proof . . . is

---

[19] In addition to his termination, Nichols alleges disparate treatment in numerous other respects. The Court agrees with IDOT that many of these other complaints are not independently actionable because they do not rise to the level of an adverse employment action and/or may be time-barred. But since it is undisputed that Nichols suffered an adverse employment action when he was terminated and timely filed his EEOC claim after that termination, the Court does not need to specifically address in detail all the forms of disparate treatment Nichols raises. Whether and to what extent Nichols can introduce evidence at trial concerning his other allegations of differential treatment will depend on a determination of their relevancy to the issue of whether IDOT acted with discriminatory intent when it fired Nichols. *See Malin v. Hospira, Inc.*, 762 F.3d 552, 561 (7th Cir. 2014) (while the defendant was correct as a matter of law that discrete discriminatory acts that are not part of an EEOC charge filed within 300 days of the date on which those acts occurred are not actionable, "[t]he district court erred by failing to consider [those time-barred events] in evaluating [the plaintiff's] [timely] Title VII [ ] claim."). Relevancy issues will be determined either at trial or upon the filing of pre-trial motions in limine.

whether the evidence points directly to a discriminatory reason for the employer's action." *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008). Discriminatory intent can be shown either through direct evidence, such as an admission that the motive was discriminatory, *Darchak*, 580 F.3d at 631, or by "circumstantial evidence which suggests discrimination albeit through a longer chain of inferences," *Luks v. Baxter Healthcare Corp.*, 467 F.3d 1049, 1052 (7th Cir. 2006). "Examples of circumstantial evidence that might suggest intentional discrimination are suspicious timing, ambiguous statements, comments directed at employees in the protected group, and examples of similarly situated employees outside the protected class who received better treatment." *Nehan v. Tootsie Roll Indus., Inc.*, 621 Fed. App'x 847, 850 (7th Cir. 2015). IDOT argues that there is no direct or circumstantial evidence that Nichols's termination had anything to do with his religion. Rather, according to IDOT, "it is undisputed" that Nichols was discharged for cause because he violated IDOT's policy against violence in the workplace. R. 136 at 10. The Court disagrees, and instead finds that Nichols has assembled a number of pieces of evidence, none perhaps dispositive in itself, but that taken as a whole point in the same direction and thus provide adequate support to avoid summary judgment. *See Sylvester v. SOS Children's Villages Ill., Inc.,* 453 F.3d 900, 903 (7th Cir. 2006).

## 1. Evidence Of Differential Treatment

Nichols testified that he was the only Muslim at the Harvey Yard and that he was treated differently than other workers, who were not Muslim.[20] For instance, Nichols testified that he was punished more severely for missed snow days and for being late to work, that he was the only worker who was prohibited from entering all thirteen rooms in the team section of the Harvey Yard, and that he was excessively scrutinized and monitored by the permanent lead and lead lead workers. Moreover, he was treated differently than other acting lead workers when he was denied the use of the supervisor's truck, he was required to bring other workers with him in one truck, he was required to stay with his crew at all times, he was given non-lead worker duties to perform, he was not sent to leadership school for training, and he was not given access to IDOT's computer system. R. 149-3.

Nichols's testimony regarding differential treatment is similar to the plaintiff's testimony in *Anderson v. Advocate Health & Hospitals Corp.,* 2014 WL 4922371 (N.D. Ill. Sept. 29, 2014). In that case, the plaintiff, who was black, also alleged that her employer used an incident of workplace violence as a pretext for firing her. In denying the employer's summary judgment motion, the court held that, notwithstanding evidence that the defendant had terminated other workers who also were accused of violating the defendant's workplace violence policy, a triable issue of fact existed on the question of discriminatory intent. The plaintiff claimed among

---

[20] The Court does not need to spend any time addressing IDOT's suggestion that Nichols's supervisors were not aware that Nichols was Muslim. The evidence in the record to the contrary is sufficient to allow a jury to decide that issue.

other things that her supervisor restricted her from leaving the building for lunch, made her work alone in an isolation unit and transport patients alone on an injured foot, and disciplined her for missing an antibiotic treatment, but that her supervisor "did not subject the White nurses to the same treatment." *Id*. at *4. The court found that the plaintiff's allegations regarding differential treatment were "of greater relevance" than the defendant's evidence of other workers who were also terminated for workplace violence. *Id*. Although the defendant "unequivocally den[ied]" the plaintiff's allegations of differential treatment, the court held that it was required to "credit [the plaintiff's] version of the events at this stage." *Id*.

### 2. Factual Dispute Regarding Seriousness Of Threats Made In Nichols's Fax

IDOT attempts to distinguish *Anderson* on the ground that it was disputed in that case whether the plaintiff actually punched a co-worker. R. 157 at 10. But the court's denial of summary judgment did not turn on that dispute. Instead, the dispute over whether the alleged act of violence actually occurred merely was one of several factors that contributed overall to the court's finding that a factual issue existed for the jury to resolve regarding the employer's discriminatory intent.

Moreover, although there is no dispute here that Nichols's sent the April 2, 2008 fax, there is a dispute regarding the seriousness of the "threats" contained in the fax. A reasonable jury could disagree with IDOT's position that the fax represents a "straight[-]forward threat of violence." R. 137 at 9 (¶ 68). To begin with, Fulgenzi's deposition testimony regarding IDOT's determination that the fax contained a

"straight-forward threat of violence" was equivocal on this point.[21] In any event, a reasonable jury might disagree with IDOT's characterization of the fax, and instead agree with Nichols that, rather than threaten violence, the fax asserted only a right to self-defense.

In addition, the jury might consider "[t]he special context in which [Nichols] expressed [his] anger," *Coleman v. Donahoe*, 667 F.3d 835, 855 (7th Cir. 2012)—to the EAP/Labor Relations office—to be important in assessing the level of seriousness of the threats contained in the fax (and hence the credibility of IDOT's stated reason for terminating Nichols). For instance, the jury reasonably might conclude that the statements in the fax were not "true threats," similar to the Seventh Circuit's reasoning in *Coleman*, where the plaintiff had told her psychiatrist that she had fantasized about killing her boss. *Id.* at 856 (finding it "troubling to think that anyone who confides to her psychiatrist . . . could automatically be subject to termination for cause"). The Seventh Circuit acknowledged that the employer in that case would have had reason to be concerned if the plaintiff had expressed to her psychiatrist "a genuine and ongoing intent to harm another person." *Id.* But the record in that case showed that the employer "had little reason to believe that [the plaintiff] posed a continuing threat"—and even more to the point, [like IDOT here], it

---

[21] *See, e.g.,* R. 136-6 at 69 (Fulgenzi Dep. 68) (referring to the fax as a "*perceived* threat of violence") (emphasis added); *id.* at 87 (Fulgenzi Dep. 86) ("When I discussed [the fax] with the Office of Labor Relations, they concurred that [the fax] *can be construed* as a threat of violence.") (emphasis added); *id.* at 187 (Fulgenzi Dep. 186) ("the statement that Mr. DeMarco made, whether or not that was to be considered a threat of violence . . . . Ultimately it was *considered to be* a threat of violence") (emphasis added).

appear[ed] to have made no effort to ascertain whether [the plaintiff] did or not." *Id*. Not only did the employer make no inquiry before terminating the plaintiff, the Seventh Circuit said, but the employer also "had good reason to believe that whatever danger [the plaintiff] ever posed had subsided by the time she sought to return to work." *Id*. A jury could find the same factors are at play in this case, which, according to the Seventh Circuit, would "give some boost to [an employee's] claim that [the employer's] asserted reasons for terminating [the employee] were pretextual." *Id*. at 857.

Finally, in assessing the severity of the threats in the fax, the jury might consider the fact that the language used by Nichols to convey the so-called "threats" mimics the language Nichols claimed in the fax that his supervisors used when they made threatening statements against him. A reasonable jury could conclude that the statements in Nichols's fax for which he was fired do no more than reflect the way employees at the Harvey Yard talked to each other all the time. *See Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 210 (2d Cir. 1990) ("even accepting the Postal Service's account of the May 2 incident, Sumner's response to Montemarano does not rise to the level of insubordination that would warrant firing, particularly when considered in light of the history of interactions between Sumner and his supervisors and what appears from the record to be the milieu of the office"); *see also NLRB v. Mueller Brass Co.*, 501 F.2d 680, 686 (5th Cir. 1974) ("Blanton's abusive outburst at Gray . . . was understandable. Expression of his anger in the language of the mill is not nearly as shocking to us as respondent's counsel would suggest.").

In sum, given all of the above, the Court declines to make a legal determination that the fax contained a "straight[-]forward threat of violence," and will leave that issue for the jury to decide.

### 3. Evidence Of Religion In The Workplace

In addition to evidence of disparate treatment, Nichols also has presented testimony from some of his co-workers that Martin, who is a Baptist (R. 137-7 at 45), had strong religious views, which he affirmatively promoted while performing his duties at the Harvey Yard. According to several of Nichols's co-workers, Martin "would arrive to work and leave work with the Holy Bible in his hand," would began meetings with a prayer, kept an open Bible on his desk, and would refer to Bible passages to make a point. R. 149-4 at 1 (Perryman Affidavit, ¶¶ 4-9).[22] One co-worker testified that, "[p]eriodically, George Martin would prophesize to me during work hours," and told "me that God appeared to him in his dreams" and "informed [him] to inform me to do certain things in my life." R. 149-4 at 1 (Perryman Affidavit, ¶ 9). The same co-worker also testified that employees at the Harvey Yard, including himself, "would be in Frank Romanski's office while Frank Romanski was present and argue about religion." *Id.,* ¶ 12. Some employees "would bring the Bible to work," and they would argue about particular Bible passages" with Romanski present. *Id.,*

_____

[22] *See also* R. 149-1 at 1 (Love Affidavit #1, ¶¶ 5, 6, 8) (Martin begins every meeting with a prayer, asks co-workers about their religion, informs others that he is a church deacon, and asks other workers to become a member of his church); *id.,* ¶¶ 9-10 (Martin has "a big book, stating Holy Bible on the cover . . . always on his desk. It was large, approximately 13" x 8" x 3-4 inches. When [he] wanted to make a point, he would refer to a passage in the Bible."); R. 150-15 (Williams Affidavit, ¶ 4) (Martin starts meetings with a prayer, has an open Bible on his desk, and carries the Bible to and from work).

¶ 14. Nichols did not participate in these discussions. *Id.*, ¶ 13. In addition, Martin admitted at his deposition that he has sent somewhere between 100 and 200 emails to other employees at the Schaumburg office containing excerpts from the Bible. R. 137-7 at 76-78.

IDOT argues the Court should ignore the affidavits of Nichols's co-workers because they are "inadmissible." R. 157 at 8.[23] For instance, IDOT repeatedly cites to Federal Rule of Evidence 404(a)(1), and asserts that the testimony of Nichols's co-workers constitutes "character evidence which is not admissible for proving action in conformity therewith." *See* R. 158, *passim.* But the testimony in question does not attempt to state an opinion regarding either Martin's or Romanski's character. *See, e.g., Michelson v. United States,* 335 U.S. 469, 477 (1948) ("What commonly is called 'character evidence' is only such when 'character' is employed as a synonym for 'reputation.'"); *Schweitzer-Reschke v. Avnet, Inc.,* 881 F. Supp. 530, 533 (D. Kan. 1995) (evidence of defendant's reputation as a "male chauvinist" inadmissible under Rule 404(a) on issue of discriminatory intent). The co-workers' testimony therefore

---

[23] The Court is under no obligation to address IDOT's evidentiary objections to the co-workers affidavits because IDOT failed to raise those objections in a proper manner. IDOT raised its evidentiary objections in its response to Nichols's Local Rule 56.1 statement of additional facts, rather than in its brief, which is not allowed under the local rules. *See Sys. Dev. Integration, LLC v. Computer Sciences Corp.*, 739 F. Supp. 2d 1063, 1068 (N.D. Ill. 2010) (factual and legal arguments in Rule 56.1 statements are improper). And, while IDOT attempted to incorporate its evidentiary objections from its Rule 56.1 response into its brief, that attempt was insufficient to preserve the issues. The references to IDOT's evidentiary objections in its brief and IDOT's citation to specific rules of evidence in its response to Nichols's fact statement are vague and conclusory, and it is well established that perfunctory arguments that are not supported by pertinent authority are generally waived. *See Davis v. Carter*, 452 F.3d 686, 691-92 (7th Cir. 2006). Nevertheless, as the Court previously noted, it will overlook the local rule violations of both parties and address the issues on the merits.

falls under Rule 404(b), relating to evidence of specific acts to show character, rather than Rule 404(a)(1), relating to opinion testimony to show character. Under Rule 404(b)(2), the testimony is admissible as evidence of prior or specific instances of conduct offered to prove, among other things, motive or intent. *See, e.g., Schweitzer-Reschke,* 881 F. Supp. at 533 ("[t]he plain language of Rule 404(b) [ ] allows for the use of specific instances of conduct" to prove "intent or motive to discriminate").

IDOT also objects on the basis of hearsay, *see* R. 158, but the statements in the co-workers affidavits appear to be based on personal knowledge. To the extent that any of the co-workers relate an out-of-court conversation or statement, the conversation or statement is not hearsay because it is not being offered for the truth of the religious matters asserted. For instance, one affiant's statement that Martin said that God appeared to him in his dreams is not offered to prove that God actually appeared to Martin in his dreams. Finally, IDOT asserts that the statements in the co-workers affidavits to the effect that Martin began meetings with a prayer "constitute inappropriate opinion testimony." R. 158 at 11-12. It is not clear to the Court how these statements, which describe events or conduct personally witnessed by the affiants, constitute opinion testimony. In any event, the Court notes that, pursuant to Federal Rule of Evidence 701, a lay witness may testify to an opinion that is "rationally based on the witness's perception and helpful to clearly understanding the witness's testimony or to determining a fact in issue."

IDOT raises two other reasons why the co-workers affidavits are insufficient to preclude summary judgment in its favor. The first is that the co-workers affidavits

are irrelevant because Nichols was terminated for making a threat, not because of his religion. That argument is unavailing because Nichols offers the co-workers affidavits concerning religion in the workplace as evidence that his April 2, 2008 fax was not the real reason for his termination. "[W]hat role if any [Nichols's] religion . . . played in h[is] discharge [as opposed to the reasons given by IDOT for his discharge] is a question that the jury must sort out." *Venters v. City of Delphi,* 123 F.3d 956, 974 (7th Cir. 1997) (holding that the city's evidence as to the legitimate reasons for terminating the plaintiff did not eliminate all doubt as to whether religion played at least a motivating role in the plaintiff's discharge) (citing *Blalock v. Metals Trades, Inc.,* 775 F.2d 703, 708-09 (6th Cir. 1985) (evidence that company owner was willing to give special consideration to those who shared his religious views, and withheld that consideration from those who did not, constitutes direct evidence that religion played a role in plaintiff's discharge))).[24]

IDOT's other argument is that the religious proclivities of Martin and others at the Harvey Yard are irrelevant because Nichols was terminated by upper management personnel (Stumpner, Fulgenzi, Iacullo, and O'Keefe). Generally speaking, IDOT is correct that comments by a non-decision maker do not suffice as evidence of discriminatory intent. *See Williams v. Seniff,* 342 F.3d 774, 790 (7th Cir. 2003). However, the Seventh Circuit has "qualified" this principle, *id.,* to say that if

---

[24] *See also Stone v. West,* 133 F. Supp. 2d 972, 982-83 (E.D. Mich. 2001) (evidence of an email in which the plaintiff's supervisor "specifically discusses the Sabbath, quotes a biblical passage calling for observance of the Sabbath, and then calls upon her employees to 'leave next Sunday free for rest and worship,' . . . gives rise to an issue of fact as to whether [the supervisor] acted on a predisposition to discriminate against Plaintiff's exercise of her religion").

the person in question has input into the decision then a reasonable jury might "infer that the decision makers were influenced by [that person's] feelings in making their decision." *Hunt v. City of Markham*, 219 F.3d 649, 653 (7th Cir. 2000); *see also Lewis v. City of Chicago*, 496 F.3d 645, 652 (7th Cir. 2007) (because individual was involved in the decision-making process, his comments "qualify as direct evidence of discrimination").

There is sufficient evidence in the record for a reasonable jury to conclude that Martin had input in the decision to place Nichols on suspension pending decision to discharge.[25] Fulgenzi, who played the leading role in the investigation into Nichols's fax and decision to terminate, testified that Nichols's chain of command had input in the decision. *See* R. 136-6 at 47-48 (Fulgenzi Dep. 46-47). Martin was Nichols's immediate supervisor and therefore part of his chain of command. Moreover, upon further questioning, Fulgenzi specifically admitted that he likely consulted with Martin as part of the process in which a collective decision regarding punishment was reached. *Id.* at 43-47 (Fulgenzi Dep. 44-48). Martin too admitted that he had conversations with Fulgenzi about the decision of whether to place Nichols on administrative leave, suspend or fire him. R. 137-7 at 172 (Martin Dep. 171). Martin also admitted that he also "may" have had such conversations with Stumpner. *Id.* at 171 (Martin Dep. 170).

In addition to the above, Fulgenzi testified that he had to rely primarily on the input he received from Nichols's chain of command in deciding whether to terminate

---

[25] There also is evidence that Romanski had influence over Martin, and that Reynolds and Thompson were Romanski's "foot soldiers."

Nichols because he personally did not have any knowledge about Nichols's behavior. When asked what information he obtained from his consultation with Nichols's chain of command was most important to his decision to recommend termination, Fulgenzi responded that he was impressed by the fact that Nichols's supervisor appeared to be extremely concerned over his own safety after Nichols sent the April 2, 2008 fax, to the point where that supervisor reported his safety concerns to the police. R. 136-6 at 52-53 (Fulgenzi Dep. 51-52). Again, the supervisor in question was Martin.[26]

Finally, Fulgenzi also suggested that it was up to the employee's immediate supervisor to decide whether to report a particular incident, even one involving violence or threats of violence, as a violation of IDOT's policy against workplace violence. *See* R. 136-6 at 57 (Fulgenzi Dep. 56). Iacullo similarly testified that an employee's immediate supervisor has discretion to deal with an incident that otherwise could have been written up as a violation of IDOT's policy against workplace violence by imposing remedial measures short of a citation for violating the policy to avoid the employee being discharged.[27] This testimony collectively

---

[26] The police report incident occurred after Martin told others that he had information that Nichols was "hanging around" the work site after being suspended for sending the fax. Nichols claims that Martin manufactured the story about Nichols visiting the work site while on suspension in order to have an excuse to file a false police report for the purpose of creating the impression that Nichols was unstable and posed a threat to others. *See, e.g.,* R. 137-24 at 3. While Martin denies these accusations, R. 137-7 at 141, the Court must credit Nichols's testimony on a motion for summary judgment.

[27] This discretion seems inconsistent with a so-called "zero tolerance" policy for workplace threats and violence. Iacullo testified: "I don't know if we have zero tolerance to violence in the workplace. I believe we do." R. 137-5 at 49 (Iacullo Dep. 48).

suggests that the employee's immediate supervisor has a great deal of control over the ultimate employment action that is taken against an employee when an issue of workplace violence arises. Once again, this testimony points to Martin as the person with the most influence over the decision to terminate Nichols.[28]

### 4. IDOT's Failure To Investigate Threats Against Nichols

Another piece of evidence that a reasonable jury could take into account in deciding whether IDOT was motivated by discrimination when it decided to terminate Nichols for a violation of the policy against workplace violence is that IDOT never took any steps to investigate threats of violence against Nichols. Nichols's testimony and his April 2, 2008 fax both describe how Nichols sent the fax in response to threats of violence that were made against him. Nichols's fax further described how Nichols had attempted to address the threats in a proper manner by contacting the EAP. Not only did the EAP not offer any help to Nichols, but it referred him to the Labor Relations Office, which also declined to help Nichols, which led Nichols to send the fax, which ironically was then used against him as a reason to fire him.

---

[28] Given the above, this case is distinguishable from *Sattar v. Motorola, Inc.*, 138 F.3d 1164 (7th Cir. 1998), wherein the plaintiff claimed that he was terminated because his former supervisor, who was a practicing Muslim, disliked the plaintiff, who was a non-practicing Muslim. The plaintiff's current supervisors in that case affirmatively testified that they reached their decision to terminate the plaintiff independent of any input from the plaintiff's former supervisor. In contrast, none of the individuals in Nichols's chain of command affirmatively testified that they did not rely on any input from Martin when they signed off on the decision to terminate Nichols.

Courts that have addressed similar situations have said that "[w]here the employer provokes a reaction from an employee, that reaction should not justify a decision to impose a disproportionately severe sanction." *Sumner,* 899 F.2d at 210. IDOT asserts in a conclusory manner that "the record is clear" that Nichols "was not 'ignored,' nor did IDOT do anything to provoke him into violating its policy against work-place violence." R. 157 at 10 n.9. But the record contains sufficient evidence as already has been discussed for that question to be put to the jury.

The Eighth Circuit's opinion in *Excel Corp. v. Bosley*, 165 F.3d 635 (8th Cir. 1999), is a good example of the provocation principle as applied in the Title VII context. There the plaintiff worked at the same meat packing plant as her ex-spouse. At trial, the plaintiff introduced evidence that her ex-spouse subjected her to sexual harassment during confrontations at work, such as calling her "bitch," "slut" or "whore," and threatening to kill her current husband. *Id.* at 637-38. The plaintiff repeatedly reported the unwelcome harassment and her fear of her ex-husband's temper to the defendant's management. *Id.* at 638. On one particular day, the plaintiff's ex-husband was near the plaintiff's work station calling her names such as "fucking bitch." The plaintiff asked the floor supervisor to relieve her temporarily from her work station, but the supervisor refused, despite knowledge of the harassment and the plaintiff's ex-husband's proximity to the plaintiff. The plaintiff's ex-husband continued to harass the plaintiff, and, out of frustration, the plaintiff pushed him "once in the chest and told him to get out of the area and go back to his assignment." *Id.* The plaintiff was sent to the supervisor's officer and told she was

being placed under "indefinite suspension" for violating a work rule against physical contact between employees. Upon leaving the work floor, the plaintiff saw her ex-husband in another room. Believing that he was not being sanctioned as strongly as she was, if at all, the plaintiff pushed past a supervisor to enter the room to talk to her ex-husband. This incident was reported as the plaintiff having struck a supervisor. These events then formed the basis for the defendant's decision to terminate the plaintiff. The ex-husband did not receive any sanction.

In upholding the jury's verdict in favor of the plaintiff on her discrimination claim, the Eighth Circuit said:

> Under Title VII . . ., an employee is entitled to relief if he or she proves that impermissible discrimination was a "motivating factor" in the employment decision, "even though other factors also motivated" the employer's decision. . . . It is not necessary that the actual termination decision be motivated by discriminatory animus. If the decision making process is tainted by discrimination, the claimant is entitled to relief. When an employee is fired because he acted to defend himself against harassment, which supervisors failed to take reasonable measures to prevent or correct, the termination process cannot be said to be free from discrimination. This is so even if the ultimate decision maker was moved purely by a legitimate concern about personnel matters.

*Id.* at 638-39 (citations omitted).[29] The Court concludes that Nichols is entitled to present evidence of provocation to the jury, which then would be entitled to consider

---

[29] *See also Hertz v. Luzenac Am., Inc.,* 370 F.3d 1014, 1022 (10th Cir. 2004) (holding that the plaintiff's "outburst constituted protest against perceived discrimination," was "a solitary event," and did "not reach the threshold of unreasonableness necessary to deprive him of the protections of Title VII," and concluding that "[a]n emotional response to a racial or religious epithet is a most natural human reaction" and that "[i]t would be ironic, if not absurd, to hold that one loses the protection of an antidiscrimination statute if one gets visibly (or audibly) upset about discriminatory

that evidence in deciding whether IDOT's decision to terminate Nichols for sending the April 2, 2008 fax was free of discriminatory intent.

### 5. Similarly Situated Employees

In addition to the above, Nichols has presented evidence of similarly situated employees who engaged or may have engaged in conduct that could or should have fallen under IDOT's policy against workplace violence but who Nichols claims or believes were not terminated for their conduct. IDOT asserts that it is Nichols's burden of proof to establish whether any of the alleged comparators in fact were similarly situated but not terminated, and that the evidence in the record identified by Nichols concerning the comparators is insufficient to meet this burden.

The Court acknowledges that there may be some evidentiary issues regarding some of the alleged similarly situated comparators which will have to be resolved if this case goes to trial. For purposes of IDOT's summary judgment motion, however, the Court concludes that at least some of the evidence submitted by Nichols— including Nichols's own testimony, an affidavit of his counsel, and documents produced by IDOT—is sufficient to create a disputed issue of fact as to whether IDOT

---

conduct"); *Mueller Brass Co.*, 501 F.2d at 686 ("more significant" than the employee's outburst was the fact that it was "spontaneous" and "provoked by the unlawful conduct of his employer"); *cf. NLRB v. M & B Headwear Co.*, 349 F.2d 170, 174 (4th Cir. 1965) (in rejecting employer's argument that an employee was terminated for her verbal outbursts rather than for her pro-union activities in violation of the National Labor Relations Act, court states that it could not "disregard the fact that the unjust and discriminatory treatment of [the employee] gave rise to the antagonistic environment in which [her] remarks were made," that to accept the defendant's argument regarding a legitimate reason for firing the employee "would be to provide employers a method of immunizing themselves from the only real sanction against violations of [the statute]," and that "refusal to reinstate [the employee] would put a premium on the employer's misconduct").

treated similarly situated employees differently than Nichols. For instance, Nichols reported that Reynolds was threatening him with bodily harm, yet Fulgenzi admitted nothing was done to look into those threats and that Reynolds is still working for IDOT. *See* R. 136-6 at 183-84 (Fulgenzi Dep. 182-83); *see also* R. 149-5 at 2 (¶ 9). Inexplicably, IDOT claims that Nichols's report that Reynolds threatened him by saying that Nichols was going to "get himself fucked up" was too "vague" of a threat to warrant investigation, while at the same time arguing that Nichols's statement in the April 2, 2008 fax that "someone in the Harvey year is going to get 'fucked up'" was "a straight[-]forward threat of violence" warranting Nichols's termination. *See* R. 149-8 at 2-5 (¶¶ 2, 3) (Defendants' Response To Plaintiff's Requests To Admit). A reasonable jury may find it difficult, as the Court has, to reconcile those two positions.

Another comparator is an employee named Stephen Cameron, who was formally charged with a threat of violence when he "made several harassing and/or threatening phone calls to the Department[']s EAP Coordinator and the District 6 Acting Personnel Manager," including voice mails stating that he had guns, that the EAP coordinator "[g]ot [him] thrown out of [his] house," that he knew what she looked like and where she lived, and that he wanted to "blow the kid's brains out" (referring to his own son). R. 171-1 at 60. IDOT did not produce any evidence that Cameron was ever terminated for these charges. *See* R. 149-5 at 2 (Plaintiff's Counsel's Affidavit, ¶ 10) ("[D]espite the plaintiff's request to produce, the defendant did not produce any document demonstrating that the defendant suspended,

disciplined or fired Stephen Cameron."). In addition to Cameron, Nichols cites to other examples of similarly situated employees, including: (1) an employee named Robert Marti, who, according to the written statement of another employee, was "out of control" when he "charged at" the other employee "screaming obscenities" only "inches from [the other employee's] face" while being restrained by a third and fourth employee, and calling the other employee "A FUCKING RAT AND SAYING YOU'RE THE BIGGEST FUCKING BEEFER IN THE WHOLE STATE," R. 149-7 at 42; (2) an employee named Anthony Altmeyer, who was accused of threatening another employee that he "would be waiting outside the gate" after work to beat up the other employee, and that he "was going to beat [the other employee] to death," R. 149-7 at 13; (3) an employee named James Jackson, who was accused in a written statement by another employee named Julius Perryman that he "knocked" Perryman out of his way," and then "pushed" Nichols, R. 149-7 at 28; *see also* R. 149-7 at 31 (Jackson pushed, elbowed and slammed into Perryman and shoved Nichols); R. 149-7 at 33 (police report filed by Perryman alleging that Jackson had been threatening Perryman since December 2005 by stating that he was going to "kick [his] ass" and follow [him] home," and stating that Perryman reported being in fear of his life); and (4) an employee named Macklin, who was accused by another employee named Marvin Harrison of "physically assaulting a third employee, and of verbally assaulting and threatening Harrison, R. 149-7 at 36; *see also id.* at 37 ("Macklin has a long history of making threats against other employees and nothing has ever been done to put a stop to this bully"). Fulgenzi testified that he could not say whether

Marti was ever disciplined. R. 136-6 at 246-47 (Fulgenzi Dep. 245-46). He testified that Altmeyer received a 10-day suspension for his conduct. R. 136-6 at 200-01 (Fulgenzi Dep. 199-200). It appears that Jackson was initially cited for an alleged threat of violence and placed on administrative leave. R. 149-7 at 30. Ultimately, however, he received only a citation for discourteous and inappropriate behavior and given a written reprimand. R. 149-7 at 27. According to an email from Fulgenzi (likely admissible at trial as a party admission), Macklin was investigated by the office of civil rights and placed on administrative leave, but after a pre-disciplinary hearing, he was placed on a 5-day suspension instead. R.149-7 at 38.

The similarly situated analysis requires a context-based examination of all relevant factors, and the Seventh Circuit has said that it "ought not be construed so rigidly or inflexibly that it [becomes] a useless analytical tool." *South v. Ill. Envtl. Protection Agency*, 495 F.3d 747, 752 (7th Cir. 2007). The similarly situated inquiry "simply asks whether there are *sufficient commonalities on the key variables* between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination[.]" *Id.* (internal quotation marks and citation omitted) (emphasis in original).

In *Coleman*, 667 F.3d 835, the Seventh Circuit considered factual circumstances very similar to those here. The United States Postal Service terminated a black female employee because she told her psychiatrist she was having thoughts of killing her supervisor. The Postal Service said it believed the plaintiff

posed a danger to her fellow employees. *Id.* at 841. The plaintiff presented evidence, however, that two white male employees at the same facility had recently threatened another employee at knife-point, yet received only one-week suspensions. *Id.* The district court held that these comparator employees were not similarly situated because they had different direct supervisors, and also that the plaintiff had not provided evidence that the Postal Service's stated reason for firing the plaintiff—that she violated its rule prohibiting workplace violence and threats—was pretextual. The Seventh Circuit reversed, holding that because the proposed comparators were disciplined by the same decision-maker, were subject to the same code of conduct, and were disciplined more leniently for violating the same rule as the plaintiff, their cases were close enough to the plaintiff's to provide a meaningful comparison and permit a reasonable jury to infer discrimination. *Id.* at 841. This same evidence, the court held, also was relevant on the issue of pretext such that the Postal Service was not entitled to summary judgment simply because it cited to a legitimate reason for firing the plaintiff. *Id.*

IDOT argues that Nichols's alleged comparators are dissimilar for essentially three reasons: (1) some of the comparators were not charged with a violation of IDOT's policy against workplace violence, like Nichols was; (2) some of the comparators were accused of violence or threats of violence in a "he said/she said" situation, versus Nichols, who made threats of violence in a fax sent to the EAP and the Office of Labor Relations; and (3) some of the comparators had their discipline reversed or reduced through remedial action such as anger management or therapy,

or as a result of a successful or partially successful grievance proceeding. These arguments are without merit.

First, the fact that some of the comparators were not charged with a violation of IDOT's policy against violence in the workplace is not a basis for arguing dissimilarity. As the Seventh Circuit explained, "the critical question" for deciding "whether two employees have engaged in similar misconduct . . . is whether they have engaged in *conduct of comparable seriousness.*" *Coleman*, 667 F.3d at 851 (emphasis added) (internal quotation marks and citation omitted). The relative comparison, therefore, is between Nichols's conduct and the conduct of the comparator. "[C]ompany discipline rules are not conclusive indicators of comparable seriousness." *Johnson v. Artim Transp. Sys., Inc.*, 826 F.2d 538, 543 (7th Cir. 1987). Moreover, "precise equivalence in culpability between employees is not the ultimate question." *Coleman*, 667 F.3d at 850. It goes without saying that actual violence is much more serious and explicit than threats of violence, even if the threat of violence is made in a fax sent to the EAP and Labor Relations Office. Some of Nichols's comparator evidence involves employees who engaged in actual violence but were not terminated. Other comparators were accused of making threats that were more serious than Nichols's alleged threats, and not couched in terms of self-defense as Nichols's fax was. The fact that some of these comparators may not have been *charged* with a violation of the policy against workplace violence does not show a lack of similarity. If anything, that fact could be cited by Nichols as additional evidence of discrimination against him.

Second, the "he said/she said" nature of some of the alleged comparators also is not a valid basis for concluding that a comparator is too dissimilar for a jury to infer discriminatory intent from the disparate treatment. IDOT appears to contend that the unique fact that Nichols's threats were made in a fax sent to the EAP and Labor Relations Office warrants a different treatment of Nichols than all the other comparators. IDOT offers no basis for saying that a verbal threat is any less serious than a written threat. Moreover, the suggestion that IDOT could not substantiate the verbal threats of other employees is belied by the record in some cases. Several of the verbal threats were witnessed by other employees, and/or IDOT made a finding that the threats actually took place. If in fact IDOT made an investigation into the alleged verbal threats and that investigation resulted in a finding that the threats had been made, then the distinction IDOT seeks to make is not compelling. In addition, IDOT should not be able to use its own lack of investigation into whether the verbal threats actually were made as a way to shield itself from the comparator evidence. In not even attempting to substantiate an alleged verbal threat, IDOT would be treating employees whose conduct consisted of written threats differently without a good reason for doing so.[30]

---

[30] For instance, Nichols testified that Reynolds made a verbal threat against him, but IDOT's position is that because it was Nichols's word against Reynold's word, IDOT had no obligation to even investigate whether the threat was made. In any event, IDOT cannot sensibly argue that the threatening voice messages left by Stephen Cameron with the EAP are distinguishable from the fax Nichols sent to the EAP. IDOT argues that Cameron is distinguishable because his threats were directed at family members rather than IDOT employees. R. 171 at 10 (¶ 16). Even if this were a valid basis for distinguishing Cameron from Nichols, the documents show that IDOT interpreted Cameron's threats as also being directed against the EAP counselor.

Third, the fact that some of the comparators had their discipline reversed or reduced through remedial action such as anger management or therapy, or as a result of a successful or partially successful grievance proceeding, also cannot be a basis for finding those comparators to be dissimilar. IDOT has taken the position in this litigation that Nichols was fired because IDOT has a "zero tolerance" policy against violence or threats of violence in the workplace. But if IDOT does have a "zero tolerance" policy, then allowing an employee to avoid discharge *for any reason* would conflict with that policy. In addition, the very fact that other employees were allowed to reduce their punishment through remedial actions such as anger management or therapy, or through the grievance process, raises the question of why Nichols was not allowed to do the same.[31]

In sum, Nichols's evidence of similarly situated co-workers suggests that the IDOT "decision-makers here did not take the rule against threats as seriously as they claimed." *Coleman*, 667 F.3d at 853. IDOT is certainly entitled to make the argument that Nichols was not similarly situated to the comparators based on non-discriminatory reasons such as those articulated by IDOT in its summary judgment briefing. But ultimately it is up to the jury to decide whether to believe IDOT's argument or whether to conclude that the only rational explanation for the difference in treatment is that Nichols was discriminated against because of his Islamic faith.

---

[31] Indeed, the fact that Nichols was not allowed to proceed with a grievance is a basis for concluding that IDOT unlawfully retaliated against him, as discussed in the next section.

### 6. IDOT's Zero Tolerance Policy

Finally, evidence regarding IDOT's stated reason for terminating Nichols—its "zero tolerance" policy—may actually support an inference of discriminatory intent in this case. Fulgenzi testified that his job as personnel manager was simply to apply IDOT's "zero tolerance" rule to charges of workplace violence or threats of violence. In other words, Fulgenzi said, if an employee is charged with an act of violence or threat of violence, then the Personnel Department automatically recommends termination of the employee. But IDOT's written policy against workplace violence does not contain any zero-tolerance language, and IDOT has not pointed to any written rule or policy that does. Moreover, assuming IDOT nevertheless adheres to "zero tolerance" as a principle, a jury could conclude that IDOT's own formulation of the rule is so malleable that discrimination cannot be excluded as a motivating factor in Nichols's discharge. *See* R. 137 at 8 (¶ 58) ("IDOT has a zero tolerance policy on threats of violence or violence in the work place, which means that *if* an incident is reported, IDOT *looks into it* to determine *whether* the conduct warrants discipline, [and] . . . . *[i]f* IDOT determines there was a violation of the zero tolerance policy, it automatically recommends discharge.") (emphasis added); *but see* R. 136-6 at 58 (Fulgenzi Dep. 57) (IDOT's "zero tolerance" policy means that the employee "*in most cases*" is discharged, but there *may be* a grievance, or other action," which results in the decision to discharge being "downgraded and remedial action, [ ] such as anger management[,] . . . recommended") (emphasis added); R. 137-5 at 49 (Iacullo Dep. 48) (zero tolerance "means that you don't have to do progressive discipline, . . . that you

*can opt to give* a sizeable suspension short of termination or termination") (emphasis added).

In *Coleman,* the Seventh Circuit noted that disparate application of the employer's "no tolerance policy" is evidence of pretext. There the Postal Service argued that it believed the plaintiff was a greater threat than two alleged comparators who were not terminated for actual violence, because the Postal Service viewed the comparators' behavior as "an 'isolated instance' where 'no particular threats were involved.'" 667 F.3d at 851. The Seventh Circuit said in response:

> The Postal Service may make that argument at trial, but it is not a winner on summary judgment. When two grown men hold a person down while brandishing a knife . . . a jury could reasonably conclude that it was a far more immediate [threat] than an employee confiding to her psychiatrist in a private therapy session that she was having thoughts about killing her boss. To be sure, the Postal Service is right to take seriously all threats made by, and against, its employees. But at the summary stage, the employer cannot defeat a plaintiff's prima facie case of discrimination on the theory that it applied its "no tolerance" policy on threats to some workers while dismissing dangerous acts of others as mere "horseplay."

*Id.*

To show pretext for an employer's stated legitimate reason for an adverse employment action, the employee "must identify such weaknesses, implausibilities, inconsistencies, or contradictions" in the employer's proffered reason such "that a reasonable person could find [it] unworthy of credence." *Id.* at 852 (alteration in original). Based on weaknesses, implausibilities, inconsistencies, and contradictions in the way IDOT articulates and applies its stated "zero tolerance" policy, the jury

might conclude that in this case IDOT used the concept of "zero tolerance" as a pretext for discrimination.

### 7. Conclusion

In summary, this case is not like others in which courts have determined that a plaintiff had shown animosity or problems between himself and his supervisor but had not shown that the animosity was tied in any way to a discriminatory motive, *see, e.g., Hopkins v. Bd. of Educ. of City of Chi.*, 73 F. Supp. 3d 974,986 (N.D. Ill. 2014) ("although Hopkins has certainly presented evidence that personal and professional animosity existed between Berman and her, she has utterly failed to tie that animosity to Hopkins' race"), or that the discriminatory motive had any connection to the adverse employment action, *see, e.g., Carothers v. Cnty. of Cook,* 2015 WL 9268078, at *7 (7th Cir. Dec. 21, 2015) ("even assuming that Ms. Welch held racial animus against African–Americans, Carothers cannot succeed . . . without showing any connection between this animus and Carothers' . . . discharge"). The record here contains adequate evidence to support a jury finding that there was animosity between Nichols and his supervisors, that the animosity was motivated at least in part by Nichols's religion, and that the animosity which was motivated by Nichols's religion played a role in Nichols's discharge. Moreover, the evidence regarding IDOT's so-called "zero tolerance" rule is not sufficient in itself to override any factual dispute regarding whether Nichols's religion was the real reason for his discharge, particularly given the mitigating circumstances surrounding Nichols's fax, which a jury reasonably could conclude warranted a lesser sanction than

termination. Those mitigating circumstances include at least the following: (1) Nichols sent the fax in what he thought was a communication with the employee assistance program, suggesting he never intended to make a public threat but rather only hoped to garner the attention of someone who would then come to his aid; (2) immediately after receiving the fax, IDOT was able to clarify the situation by discovering what provoked Nichols to send the fax, which should have led to an investigation to determine whether Nichols in fact posed any real threat; (3) the alleged threatening statements in the fax were couched in terms of self-defense after threats of violence were made against Nichols; (4) Nichols had asked for but was not given help from his employer in putting a stop to these threats; (5) the threatening language in the fax mimics the threats that were made by others against Nichols; and (6) Nichols has never been violent or threatened violence before this incident. It is up to the jury to view the evidence in its totality and determine whether IDOT's stated reason for terminating Nichols was sincere or a pretext for discrimination. Accordingly, Nichols has met his burden of proof under the direct method for showing a factual dispute regarding his employer's discriminatory intent warranting a jury trial on Nichols's disparate treatment claim.

### C. Retaliation

Nichols's final claim is that IDOT retaliated against him for engaging in protected activity under Title VII. A claim of retaliation under Title VII is analyzed under the same direct/indirect framework as a claim of discrimination. *Porter,* 700 F.3d at 957. Like Nichols's disparate treatment claim, the Court will address

Nichols's retaliation claim under the direct method of proof. Under the direct method of proof, Nichols must produce evidence from which a reasonable jury could conclude: (1) that he engaged in a statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) there was a causal link between the two. *Id.* "Whether [the court] appl[ies] this method formally or just cut[s] to the chase and ask[s] the fundamental question directly—could a reasonable trier of fact infer retaliation?—makes no difference." *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015).

### 1. Termination

The first element requiring a materially adverse employment action is satisfied by Nichols's termination. The question is whether Nichols has engaged in protected activity causally linked to his termination. The Court will consider several possibilities.

### a. Religious Accommodation Grievance

Nichols filed a grievance requesting a religious accommodation, which clearly constitutes protected activity. To establish a material issue of genuine fact whether Nichols's religious accommodation request caused his termination, Nichols relies on circumstantial evidence. "Circumstantial evidence suffices if a convincing mosaic of circumstantial evidence would permit a reasonable trier of fact to infer retaliation by the employer. In retaliation cases, [the Seventh Circuit] [has] recognized three categories of circumstantial evidence available to a plaintiff using the 'convincing mosaic approach.' These categories include (1) evidence of suspicious timing,

(2) evidence that similarly situated employees were treated differently, and (3) evidence that the employer's proffered reason for the adverse employment action was pretextual." *Castro*, 786 F.3d at 564-65 (internal quotation marks and citations omitted). The Court already has identified substantial evidence under the last two categories in its discussion of Nichols's disparate treatment claim; much of this same evidence is relevant to Nichols's retaliation claim as well. *See also,* R. 150-15 (Williams Affidavit, ¶¶ 5-6) (affidavit of co-worker testifying that he has heard Romanski complain on several occasions in the presence of Reynolds and Martin about Nichols requesting an accommodation to pray, and asking "why does he want special privileges to pray").

In addition to this evidence, Nichols can add evidence of suspicious timing. The Seventh Circuit has "rejected any bright-line rule about how close the events must be to establish causation, but in cases where there is corroborating evidence of retaliatory motive, an interval of a few weeks or even months may provide probative evidence of the required causal nexus." *Id.* at 565 (internal quotation marks and citation omitted). Nichols was suspended pending a decision to discharge less than a month after he filed his grievance requesting a religious accommodation. Therefore, Nichols has met his burden on summary judgment of producing evidence on causation sufficient to present this retaliation claim to the jury.

### b. Complaints about Disparate Treatment and Threats/Harassment

In addition to his request for a religious accommodation, Nichols's complaints to IDOT about differential treatment and harassment by his supervisors also might

satisfy the protected activities component of Nichols's retaliation claim. Complaints of discrimination are statutorily protected activity, but the "complaint must indicate the discrimination occurred because of . . . some . . . protected class. Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) (citations omitted). IDOT argues that Nichols never told his supervisors that he believed the reason for his differential treatment was religious discrimination. As the court in *Weintraub v. Mental Health Auth. of St. Mary's, Inc.*, 2010 WL 4868095, at *6 (D. Md. Nov. 23, 2010), stated, however, it is not necessary that the plaintiff "utter . . . magic words" in opposing an employer's discriminatory conduct if the context of the plaintiff's complaints allow a reasonable inference that it is. *See, e.g., Lerman v. Turner,* 2013 WL 4495245, at *15 (N.D. Ill. Aug. 21, 2013) (*Tomanovich* inapplicable where attention was drawn to fact that individual who was terminated was Palestinian such that reasonable inference could arise that the alleged discrimination was based on anti-Arab sentiment).

The record contains sufficient evidence from which a reasonable jury could conclude that even though Nichols never explicitly stated there was a connection between his differential treatment and his religion, it was reasonable to infer from the circumstances that IDOT knew that Nichols was complaining about discrimination based on his Islamic faith. *See, e.g.,* R. 149-1 (Love Affidavit #1, ¶¶ 44-45) (co-workers asked Thompson why management treated Nichols "so poorly when

he became acting lead worker, belittling him, stripping him of things that ordinarily went with a supervisor," and Thompson stated "that Muslims were troublemakers" and "that the problem with DeMarco was DeMarco's religion"). In addition, Fulgenzi testified that Nichols's allegations in his April 2, 2008 fax about being threatened and harassed were "forwarded to the Office of Civil Rights." R. 136-6 at 173 (Fulgenzi Dep. 172). This testimony is direct evidence that IDOT recognized that Nichols's complaints of harassment were based on religious discrimination.

The Court also finds support in the case law that asserting self-defense against threats of violence directed against an individual because of his religion is itself protected activity (as opposed to the protected activity being the communication complaining about unlawful discrimination). In *Van Horn v. Specialized Support Services, Inc.,* 241 F. Supp. 2d 994 (S.D. Iowa 2003), an employee working with a special needs population was subjected to ongoing inappropriate sexual conduct by a twenty-one year old male client with Down's syndrome. *Id.* at 999-1002. The plaintiff notified her supervisor and later expressed concern at a staff meeting, but she was offered no assistance or guidance and no action was taken by her employer to address the ongoing situation. *Id.* at 1001. The problem continued to escalate, and culminated when the plaintiff "instinctively slapped" the client after he inappropriately pinched her breast. *Id.* at 1004. Based on the purported justification that "slapping a mentally retarded person was never justified," the plaintiff's employment was terminated. After recognizing that Title VII certainly does not grant employees a free

license to unreasonably engage in violence to protest discrimination, the Court concluded,

> the law is equally clear that an individual who is unlawfully attacked and has no opportunity to seek legal recourse may reasonably act to defend against physical harm. See 1 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 5.7(a) (1986). See also Restatement (Second) of Torts §§ 63–66 (recognizing the right to the use of force in self-defense). Therefore, where employees find themselves in such an exigency and act in their own defense, they are not engaging in "unreasonable" oppositional activity. . . . [W]hen an employer's failure to act forces an employee to act in self-defense at the workplace, the employee's defensive conduct is reasonable and the employee cannot be terminated for doing so.

*Id.* at 1012–13.

If Nichols had a protected right, as the above passage suggests, to defend himself against violence directed at him because he is a Muslim, then his verbal assertion of that right in the April 2, 2008 fax also would constitute oppositional activity protected by the anti-retaliation provision of Title VII. As the *Van Horn* court observed, an employer is "certainly free to maintain [a] 'zero-tolerance' policy," but "it cannot do so without also protecting its workers from unlawful harassment. To allow an employer to ignore clear warning signs and then terminate an employee who resists sexual harassment and assault at the workplace [or, as in this case, who resists threats of violence based on his religion] is to deny the employee the basic protection against discrimination which Title VII affords." *Id.*; *see also Speed v. WES Health Sys.*, 93 F. Supp. 3d 351, 364 (E.D. Pa. 2015) ("Even if one were to conclude that Speed's conduct in striking her harasser was inappropriate under all of the

circumstances, it would be profoundly anomalous to protect the very employer which had failed in the first instance to protect her; but for that failure, Plaintiff need not have confronted an escalation of Garway's behavior.").

### c.    2006 and 2007 Grievances

Finally, Nichols cites to protected activity occurring in 2007, when he filed an EEOC charge for race discrimination, as well as in 2006, when he filed a claim complaining that employees were harassing him because he was Muslim and that IDOT transferred him for going to his car to pray. While an independent claim of disparate treatment based on these allegations would be time-barred, that does not preclude Nichols from relying on this evidence to support his timely retaliation claim based on his 2008 termination. *See Malin*, 762 F.3d at 560-61. The problem with Nichols's reliance on this 2006 and 2007 protected activity for purposes of his 2008 retaliation claim is not that such a claim would be time-barred but that the earlier protected activity may be too remote in time to establish a causal connection with Nichols's 2008 termination. Nevertheless, the Seventh Circuit has held "that the mere passage of time 'does not conclusively bar an inference of retaliation.'" *Castro*, 786 F.3d at 565 (quoting *Malin,* 762 F.3d at 560 (reversing summary judgment for employer where evidence showed patient retaliation over period of several years)). In *Malin,* the Seventh Circuit cited case law finding retaliation where the protected activity and the plaintiff's termination were separated by up to two years. 762 F.3d at 559. The Court cannot say on the current record as a whole that Nichols's 2008

termination as a matter of law was not proximately caused by Nichols's 2006 and

2007 grievances complaining about race and religious discrimination against him.[32]

## 2. IDOT's Refusal To Conduct Grievance

It is undisputed that the union filed a grievance on Nichols's behalf to contest

his termination. *See* R. 137-31 at 2-3.[33] It also is undisputed that a hearing was

---

[32] That there is possibly a connection, for instance, is supported by Fulgenzi's testimony about the matters he considered to be important in deciding to recommend that Nichols be terminated. One of those matters was Fulgenzi's belief that Nichols "had up to that point engaged in . . . behavior that many people . . . didn't feel comfortable with." R. 136-6 at 52 (Fulgenzi Dep. 51). When asked what he meant by that statement, Fulgenzi said that he "would have to look at the record as a whole," but also cited to "numerous correspondence from Mr. Nichols, *grievances, and things of that nature* . . ." *Id.* at 53 (Fulgenzi Dep. 52) (emphasis added). When asked whether he had any information that Nichols exhibited any signs of violence during his ten years of employment with IDOT, Fulgenzi's only response was to again cite to the "great volume of . . . typed up letters and other documents" in Nichols's personnel file, which Fulgenzi found to be "peculiar" because they "were extremely hard to understand and to put together, and  . . . personally gave [him] a concern and gave [him] pause." *Id.* at 54 (Fulgenzi Dep. 53). When asked why they gave him pause, Fulgenzi repeated that the letters and documents were "typed up . . . [in] a very tight space," and "hard to understand." *Id.* at 55 (Fulgenzi Dep. 54); see *also* R. 136-6 at 172-73 (Fulgenzi Dep. 171-72) (Nichols "sent a large amount of documents handwritten very tightly . . . [with] a lot of allegations contained in it"). There are any number of ways a jury might interpret this testimony, but the Court does not think it would be unreasonable for the jury to conclude that behind Fulgenzi's comments was the fact that Nichols's personnel file contained a number of grievances he had filed over the past years, including complaints of discrimination related to being Muslim. Notwithstanding that some of those complaints were several years old, Fulgenzi's testimony could be read as evidence that he considered those older complaints in deciding what to do about the 2008 situation which led to Nichols's firing.

[33] IDOT suggests that there is a dispute over whether Nichols sought relief for his termination through the grievance process. *See* R. 136 at 19. But Nichols's grievance was filed on his behalf by the union and is part of the record before the Court. R. 137-31. The facts cited by IDOT—that Nichols did not fill out the grievance form himself and has never seen it, and that the union did not state in the grievance form that Nichols believed he was terminated because of his religion—do not create any issue

64

convened on July 11, 2008 to discuss Nichols's grievance, R. 158 at 46 (¶ 23), and that IDOT did not allow Nichols to continue with the grievance hearing unless he withdrew his pending EEOC charge, R. 149-3 at 6 (¶ 25).[34] The basis for IDOT's actions with respect to Nichols's post-termination grievance is Section 6.2 of the collective bargaining agreement between IDOT and Nichols's union. Section 6.2 provides that if a grievant has filed an appeal with the EEOC over the same subject matter as the grievance, then the grievance procedures found in the collective bargaining agreement "will not be applicable." R. 137-12 at 8. Fulgenzi explained his understanding of Section 6.2 and how it affected Nichols's post-termination grievance as follows:[35]

> [I]f an employee has filed a grievance . . . in conjunction with filing a charge with the EEOC or [Illinois] Department of Human Rights, I [would] have brought up

---

of fact regarding whether Nichols filed a grievance to contest his termination, the only relevant issue here.

[34] In responding to Nichols's statement of additional facts, IDOT "disputed" the statement that IDOT did not allow Nichols to continue with the grievance hearing unless he withdrew his pending EEOC charge, but only "to the extent that [it] mischaracterizes the evidence cited." R. 158 at 47. Nichols's fact statement did not mischaracterize the evidence, however, *see* R. 137-3 at 191, and his affidavit affirmatively states that Fulgenzi told him that in order to proceed with the grievance he needed to withdraw his EEOC claim. *See* R. 149-3 at 6 (¶ 25). Moreover, Fulgenzi's testimony is not inconsistent with Nichols's affidavit; Fulgenzi testified only that he could not remember what he said to Nichols. *See* R. 137-6 at 60 (Fulgenzi Dep. 59). More importantly, it is clear from IDOT's summary judgment papers that IDOC's position *is* that Nichols was required to choose between his EEOC claim and his grievance, and IDOT admitted as much in discovery, R. 149-8 at 5-6 (¶¶ 14, 16).

[35] Because Fulgenzi testified he could "not recall" what he actually said to Nichols, R. 136-6 at 60, his explanation is stated in terms of what he hypothetically would have said to Nichols.

the fact that the Union contract clearly states that the employee cannot do both. So . . . I would have said to . . . Mr. Nichols[ ] . . . [that] [t]his is not a grievable matter because if you file a charge with the EEOC, then there is no grievance rights.  . . . I would not recommend or mandate that the employee drop the charges with the EEOC. I would say if the employee chooses to drop the charges with the EEOC, then maybe the grievance process would be available to that employee.

R. 137-6 at 61 (Fulgenzi Dep. 60).

In *EEOC v. Board of Governors of State Colleges & Universities*, 957 F.2d 424, 431 (7th Cir. 1992), the Seventh Circuit held that "[a] collective bargaining agreement may not provide that grievances will proceed to arbitration only if the employee refrains from participating in protected activity under the ADEA." Like Section 6.2 in this case, the collective bargaining provision in *Board of Governors* "authorize[d] [the defendant] to take an adverse employment action (termination of the in-house grievance proceeding) for the sole reason that the employee has engaged in protected activity (filing an ADEA claim)." *Id.* at 430. The Seventh Circuit held that this was discriminatory on its face and constituted "a *per se* violation" of ADEA's anti-retaliation provision. *Id.* at 429.

IDOT argues that *Board of Governors* is inapplicable here because it was decided twenty-three years ago and because it applies the anti-retaliation provision of the ADEA rather than Title VII. *See* R. 157 at 20. IDOT does not say on what basis this Court would be free to ignore controlling Seventh Circuit precedent, even if it is from twenty-three years ago. In any event, the Court concludes that the Seventh Circuit's analysis in *Board of Governors* is just as compelling today as it was in 1992.

*See, e.g., Trayling v. St. Joseph Cnty. Emp'rs Chapter Of Local #2955*, 953 F. Supp. 2d 793, 800 (W.D. Mich. 2013) (adopting the "cogent" analysis of *Board of Governors* in holding that an election-of-remedies provision of a collective bargaining agreement violated the anti-retaliation provisions of the ADEA and ADA); *Brinkley v. Bd. of Comm'rs of Franklin Cnty., Ohio,* 2013 WL 394158, at *5-6 (S.D. Ohio Jan. 29, 2013) (relying on *Board of Governors* in holding that the plaintiff had "demonstrated a strong likelihood of success of the merits" of her retaliation claims because her grievance was dismissed pursuant to a collective bargaining agreement which prohibited her from maintaining both a grievance and an EEOC charge regarding the same circumstances that led to her removal).

In addition, IDOT does not explain why the fact that *Board of Governors* involved the anti-retaliation provision of the ADEA rather than the anti-retaliation provision of Title VII is a distinction that matters. As stated in *Board of Governors,* "[s]tatutory provisions against retaliation such as those in the ADEA *and Title VII* protect employees' rights to participate in protected activity and aid the work of the EEOC which depends upon employee cooperation." 957 F.2d at 431 (emphasis added); *see also Brinkley,* 2013 WL 394158, at *5 (applying *Board of Governors* to Title VII retaliation claim); *Portland State Univ. Chapter of Am. Ass'n of Univ. Professors v. Portland State Univ.*, 291 P.3d 658 (Or. 2012) (en banc) (same). IDOT admits that Nichols could have contested his termination through the grievance process or filed a complaint concerning his termination with the EEOC, but not both. Such a policy adversely affects Nichols by "stripping him . . . of an employment

privilege for filing with the EEOC. Such activity is expressly prohibited by the literally interpreted provisions of both the ADEA and Title VII." *EEOC v. Gen. Motors Corp.*, 826 F. Supp. 1122, 1126 (N.D. Ill. 1993).

The Court therefore finds that IDOT's invocation of Section 6.2 of the collective bargaining agreement to prevent Nichols from challenging his termination through both a grievance proceeding and an EEOC charge constitutes a per se violation of the anti-retaliation provision of Title VII. Although Nichols has not moved for summary judgment on this claim, the Court has the authority to enter summary judgment on its own motion. *See* Fed. R. Civ. P. 56(f). Before doing so, however, the Court will permit IDOT to file a supplemental memorandum of law addressing whether any disputed issues of fact would prevent the Court from entering summary judgment in Nichols's favor under the holding of *Board of Governors. See Hotel 71 Mezz Lender LLC v. Nat'l Retirement Fund*, 778 F.3d 593, 603 (7th Cir. 2015) (whenever a court entertains the possibility of summary judgment against a party *sua sponte*, the court must afford the party notice of that possibility and a reasonable opportunity to respond).

### III.

### CONCLUSION

For the reasons stated herein, Defendants' motion for summary judgment [R. 135] is denied. Further, within fourteen days from the date of entry of this order, IDOT may file a supplemental memorandum of law of no more than five pages explaining why the Court should not enter summary judgment against IDOT on

68

Nichols's retaliation claim based on IDOT's denial of Nichols's post-termination grievance. Nichols may file a response brief of the same length within fourteen days thereafter. No reply briefs shall be filed. If IDOT fails to file a supplemental memorandum of law, the Court will assume that IDOT concedes that no factual disputes exist regarding Nichols's retaliation claim based on the denial of his post-termination grievance, and will enter partial summary judgment in favor of Nichols on that claim in accordance with the reasoning set forth in this opinion.

This case is set for a jury trial on June 13, 2016. It was represented by the parties that the trial will last no more than 5 days. The case is set for a status conference on Wednesday, January 27, 2016 at 9:00 a.m. to discuss trial scheduling issues.

ENTERED:

_____ *Thomas M. Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: January 19, 2016