**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

DeMarco Nichols,                       )
                                       )
    *Plaintiff,*               )
                                       )
v.                                     )     No. 12-cv-1789
                                       )
Illinois Department of Transportation, )
Illinois Department of                 )
Central Management Services,           )     Hon. Judge Thomas M. Durkin
                                       )
    *Defendants.*              )

## MEMORANDUM OPINION AND ORDER

DeMarco Nichols filed this lawsuit under Title VII against the Illinois Department of Transportation ("IDOT") and the Illinois Department of Central Management System ("CMS") in March 2012. On September 29, 2016, a jury found Defendants liable for discrimination and retaliatory conduct based on Nichols' religion. Currently before the Court is Nichols' post-trial motion for attorney's fees. R. 290. For the following reasons, the Court grants Nichols' petition in part and awards Nichols' counsel $774,584.50 in fees and $4,061.02 in costs.

## Background

Nichols alleged IDOT failed to accommodate his religious practices (Nichols is Muslim), discriminated against him based on his religion, and retaliated against him after he filed grievances complaining about the discrimination, all in violation of Title VII. A detailed summary of the factual background in this case can be found at *Nichols v. Illinois Dep't of Transportation*, 152 F. Supp. 3d 1106, 1111 (N.D. Ill. 2016).

In short, Nichols alleged he suffered hostility and threats by IDOT employees because of his religion. Nichols filed several grievances but none were addressed by IDOT. As a result, Nichols became frustrated with how he was treated and eventually sent a fax on April 2, 2008 to the Employee Assistance Program and the Labor Relations Department. The fax laid out the details of the discrimination and hostility and Nichols threatened to protect himself with violence if he was physically attacked. IDOT construed this fax as a threat and suspended Nichols the next day. IDOT then terminated Nichols effective June 4, 2008.

To appreciate the length of time needed to get this case to trial, a brief discussion of the procedural history is warranted. Nichols filed his complaint on March 11, 2012. Fact discovery was initially set to close in October 2012, but was extended to April 2, 2013 after Nichols filed several motions to compel information and documents from Defendants. R. 25, 28, 33, 53, 62 (all motions to compel by Nichols). Both parties were at fault for this delay—Nichols issued extremely broad and unnecessarily extensive document requests, while Defendants read the requests too narrowly. (So narrowly in fact, that the Court ordered additional discovery to be produced on the eve of trial, as will be discussed below.) On April 8, 2013 after discovery was closed, Nichols filed a motion to amend the complaint based on facts learned during discovery, which the Court granted on July 1, 2013. R. 83. Defendants were allowed to supplement their discovery and were allowed to depose Nichols for a limited time based on the new complaint.

In March 2014, the Court held a summary judgment conference to narrow the issues to be resolved by dispositive motions. At that time, the parties agreed to have a settlement conference instead of filing dispositive motions. In June 2014, the parties attended a settlement conference with Magistrate Judge Finnegan, which was unsuccessful. R. 127. Defendants then filed their summary judgment motion in April 2015. R. 135. The motion was fully briefed on August 21, 2015. R. 157. During oral argument on the summary judgment motion on September 9, 2015, the Court questioned whether IDOT had ever disciplined employees with a sanction less severe than termination for similar conduct. Defendants had already provided some information regarding that question as to employees in similar roles as Nichols in the same geographical area (Region 1), but had not produced information agency-wide. On November 18, 2015, the Court ordered Defendants to respond to an exhibit offered by Nichols on summary judgment (R. 150-8) that described employees who had made more severe threats than Nichols but were disciplined less severely or in some cases were not even disciplined. Defendants had previously objected to the chart because it contained additional facts beyond that allowed by the civil rules. In ordering Defendants to respond, the Court noted the importance of the information to the case, and Nichols' inability to obtain that information otherwise. On January 19, 2016, the Court denied Defendants' summary judgment motion, finding there were genuine disputes of fact, primarily related to these comparators, warranting trial. R. 174.

Judge Finnegan held another unsuccessful settlement conference on March 31, 2016. R. 189. Then, on May 27, 2016, the Court on its own motion ordered further

discovery beyond Region 1 regarding allegedly similarly situated IDOT employees who were accused of or investigated for making threats or committing acts of violence. R. 198. The Court ordered IDOT to run searches for the remaining regions for the years 2004 to 2010 and provide reports to the Court. The Court explained that discovery had been previously limited to Region 1 on the theory that a comparator who is not disciplined by the same supervisor is not similarly situated. Later, however, IDOT argued that Nichols was terminated based on a zero-tolerance policy that was automatic, regardless of the region or who the decision-maker was. The zero-tolerance defense made IDOT-wide comparators relevant. The Court also criticized Defendants' response to Nichols' exhibit regarding comparators because it was argumentative and did not factually set forth explanations for the differing (and often lesser) discipline others received compared to Nichols. Because of Defendants' failure to produce this information, the Court ordered Defendants to produce additional and more specific information regarding similarly situated comparators.

During pre-trial preparations on September 14 and 15, 2016, Defendants indicated they intended to present five witnesses at trial that were not disclosed on Defendants' initial disclosures and were not added to those disclosures during the case. Because Nichols was aware of these witnesses generally (though Defendants had represented they would not be called at trial), the Court did not bar the witnesses from trial but allowed Nichols to take last-minute limited depositions of these witnesses, with costs to be paid by Defendants. Finally, on September 15, 2016, this Court held a third settlement conference, but that too was unsuccessful.

Trial began on September 19, 2016. The jury heard numerous examples of other IDOT employees who engaged in conduct similar to that of Nichols, or in many cases much more egregious conduct. The jury also heard that many of these employees received less discipline and rarely were terminated. On September 29, 2016, the jury returned a verdict for Nichols on most of his claims, but found for Defendants on one part of Nichols' retaliation claim. The jury awarded Nichols $1,500,000.00, which was subsequently reduced to $300,000 because Title VII caps damages.

After nearly a year of briefing on various equitable damage issues, the Court also ordered Nichols to be reinstated to his previous position and awarded Nichols $952,156 in back wages, overtime, pension benefits, reimbursement of sick days, prejudgment interest, and reimbursement for a negative tax consequence as a result of his lump sum payment from the jury award. Nichols also received credit for the vacation days he would have received had he been continuously employed with IDOT. The Court entered final judgment on November 7, 2017. R. 303. In sum, Nichols achieved a significant victory on a difficult set of claims.

On August 11, 2017, Nichols filed the present motion for attorney's fees under 42 U.S.C. § 2000e-5(k) seeking $1,709,345 in fees and $4,460.47 in costs. As will be discussed in detail below, the fees are significantly overstated and will be reduced by the Court through the determination of a reasonable hourly rate and reasonable hours. The case could have and should have been handled more effectively by Nichols' counsel. The reductions will reflect that. However, not all the responsibility for the

length of time needed for this case to be resolved and the amount of fees charged was the fault of Nichols. Instead, as detailed above, Defendants were less than forthcoming as to important discovery regarding comparators and other relevant witnesses. As night follows day, delays inevitably cause fees to accumulate. So, although the reduction in fees is large, the remaining fee award is itself also large, in part because of Defendants' delay.

## Analysis

The starting point for determining Nichols' "reasonable attorney's fees" is the lodestar, which is "the hours reasonably expended multiplied by the reasonable hourly rate." *Johnson v. GDF, Inc.*, 668 F.3d 927, 929 (7th Cir. 2012). The Court has an obligation to "exclude from this initial fee calculation hours that were not reasonably expended" on the litigation. *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983). The party seeking the fee award bears the burden of proving the reasonableness of the hours worked and the hourly rates claimed. *Id*. at 433. But the Court has significant discretion in determining the lodestar based on the hours reasonably expended. *Johnson*, 668 F.3d at 929. Moreover, the Court is "not obligated to conduct a line-by-line review of the bills to assess the charges for reasonableness." *Rexam Beverage Can Co. v. Bolger*, 620 F.3d 718, 738 (7th Cir. 2010).

Once the lodestar is determined, the Court must decide whether it is appropriate to adjust the lodestar. *Sommerfield v. City of Chicago*, 863 F.3d 645, 650 (7th Cir. 2017). A downward adjustment may be appropriate where a plaintiff achieves "only partial or limited success." *Montanez v. Simon*, 755 F.3d 547, 556 (7th

Cir. 2014). On the other hand, an upward adjustment may be appropriate where the plaintiff achieves "[e]xtraordinarily good results." *Sommerfield*, 863 F.3d at 650. If a court elects to adjust a fee award, it must "provide a concise but clear explanation of its reasons." *Small v. Richard Wolf Med. Instruments Corp.*, 264 F.3d 702, 708 (7th Cir. 2001). In other words, the Court cannot simply "eyeball the fee request and cut it down by an arbitrary percentage because it seemed excessive to the court." *Id.*

Nichols' fee petition seeks $1,709,345 in fees incurred through June 22, 2017, after trial and after equitable relief had been mostly finalized, but before the Court entered final judgment. For purposes of the lodestar, Nichols contends his attorney's rate is $550 an hour for 3,107.9 hours expended on this case, totaling the $1.7M Nichols seeks. Nichols also seeks a 15% upward adjustment on top of this number, because of the "substantial risk" his attorney took on with this contingency-fee based case, the relevant amount of success, counsel's delay in being paid, and the deterrent effect of a large fee award. Defendants argue that Nichols is entitled to only $286,931.02 in fees. They challenge the hourly rate sought as well as the hours claimed. Defendants also contend a downward adjustment is appropriate because of the litigation tactics Nichols' attorney used. The Court will first address the appropriate lodestar calculation, including the reasonableness of the hourly rate claimed and the hours total and then turn to the parties' respective arguments for downward or upward adjustments.

# I.  Lodestar Calculation

## A.  Hourly Rates

Nichols seeks a rate of $550 per hour for the work performed by his attorney, Joseph Anthony Longo. In support, Nichols presents affidavits of his attorney, six other attorneys, and the Laffey Matrix.[1] Defendants point to recent cases in which courts held Mr. Longo's rate is significantly lower than $550.

The hourly rate component of the lodestar "must be based on the market rate of the attorney's work." *Gautreaux v. Chi. Hous. Auth.*, 491 F.3d 649, 659 (7th Cir. 2007). The relevant reference point for determining a market rate is the amount charged by attorneys of comparable skill, experience, and reputation for similar work. *Id.* "[O]nce an attorney provides evidence establishing [the] market rate, the opposing party has the burden of demonstrating why a lower rate should be awarded." *Id.*

### i.  Affidavits

Three of the affidavits and declarations—the Affidavit and Declaration of John P. DeRose (R. 290-1), the Declaration of Robin Potter (R. 290-2), and the Declaration of Dennis R. Favaro (R. 290-7)—merely opine on the reasonableness of the rates claimed by Nichols' counsel without providing their own market rates or the rates comparable attorneys charge for similar work. Accordingly, the Court finds those affidavits and declarations unpersuasive. *Montanez*, 755 F.3d at 554 ("[c]onclusory

---

[1] The Laffey Matrix is a table of hourly rates prepared by the United States Attorney's Office in the District of Columbia for attorneys in the Washington, D.C. area that some circuits use to help determine a reasonable fee under fee-shifting statutes. *Iroanyah v. Bank of Am.*, 753 F.3d 686, 694 (7th Cir. 2014).

affidavits from attorneys merely opining on the reasonableness of another's fee—unlike affidavits describing what comparable attorneys charge for similar services—have little probative value").

The remaining three declarations—the Declaration of David L. Lee (R. 290-3), the Declaration of Aaron B. Maduff (R. 290-4), and the Declaration of John T. Moran (R. 290-6)—provide the hourly rate charged by each declarant, but it is not clear that their rates are for similar work. None of those affidavits states that clients have actually paid or that they have been awarded their respective hourly rates in cases similar to Nichols' case. Instead, although Mr. Lee practices primarily in the civil rights and labor and employment fields, his affidavit only generally states that he has collected $625 an hour for general litigation, an EEOC Charge, settlement negotiations, severance and contract negotiations, and employment advice. R. 290-3 ¶ 14. But he does not state any of those cases involved employment discrimination litigation like here. Mr. Maduff too generally states he practices employment and civil rights law and that his rate is $675 from hourly clients, R. 290-4 ¶ 24, but offers no indication that he receives that rate in cases similar to the one here. The same is true with Mr. Moran—he states only that his billing rate of $600 an hour has been judicially approved in two cases without reference to the nature of those cases. *See* R. 290-6 at ¶ 6. An hourly rate that was judicially approved or that was actually paid by clients for work similar to that done here would have been significantly more persuasive.

In any event, it is not clear to the Court that Mr. Longo's experience, skill, and reputation are comparable to these declarants. For example, Mr. Lee's affidavit indicates that he has more experience and it is clear that he has a different reputation in the community than Mr. Longo. Mr. Lee has a number of professional affiliations with organizations relating to civil rights and employment law and has taken on significant roles with such professional organizations, including serving on the National Employment Lawyers Association's Board of Directors. R. 290-3 at ¶ 6(i). Mr. Lee has written nearly two dozen articles and has given more than 50 presentations on legal matters, including many employment related matters. *Id*. at ¶¶ 7-8. Mr. Lee also worked as a clinical professor at Chicago-Kent College of Law from 1984 to 1991, maintaining a clinical practice in the field of employment discrimination, wrongful discharge, and civil rights related matters. *Id*. at ¶ 9. Mr. Maduff likewise avers that he has significant experience teaching and publishing articles related to employment law, and that he is the current author of "James Publishing's Litigating Sexual Harassment and Sex Discrimination Cases." *See* R. 290-4 ¶¶ 16-17.

While there is no question Mr. Longo has been practicing long enough to be considered experienced, length of time practicing is not by itself dispositive of a certain hourly rate, particularly given Mr. Longo's reputation because of the extraordinary criticism of his work by other courts. *See, e.g., Sommerfield v. City of Chicago*, 2012 WL 5354987, at *3 (N.D. Ill. Oct. 29, 2012), *report and recommendation adopted*, 2013 WL 139502 (N.D. Ill. Jan. 10, 2013), *aff'd*, 863 F.3d 645 (7th Cir. 2017)

("[Mr. Longo's] willful misconduct time and time again results in needless and unreasonable expenditures of time for which he invariably seeks compensation through inflated fee awards and courts have repeatedly condemned his behavior in published opinions that could not be more critical of a lawyer."); *see also infra* n.3. Thus, although the Court considers the affidavits filed by other attorneys, it gives them limited weight. *Small v. Richard Wolf Med. Instruments Corp.*, 264 F.3d 702, 707 (7th Cir. 2001) ("Although the district court must consider submitted evidence of the hourly rates of attorneys with comparable experience, the court is entitled to determine the probative value of each submission and must arrive at its own determination as to a proper fee."). The Court also gives little weight to Mr. Longo's affidavit (R. 290-5), which summarily suggests his fees are "reasonable, necessary, and customary," for similar reasons. *Harper v. City of Chi. Heights*, 223 F.3d 593, 604 (7th Cir. 2000) ("[A]n attorney's self-serving affidavit alone cannot establish the market rate for that attorney's services."). In his affidavit, Mr. Longo fails to point to any actual evidence of the market rate, stating only that "based upon my many contacts with employment attorneys over the years, their experience and reputation, their hourly rates, my research of the market rates compared with my skill and experience with attorneys of similar skill and experience, my requested $550 per hour is below the market." R. 290-5 at ¶ 17. Mr. Longo does not address the many courts that have criticized his litigation style. *See infra* n. 3.

### ii.    Recent Fee Awards

Even if the evidence provided did support a rate of $550 per hour, several courts have recently found a reasonable rate for Mr. Longo to be much lower. Specifically, in July 12, 2017, the Seventh Circuit affirmed a district court fee award based on an hourly rate of $300. *Sommerfield*, 863 F.3d at 650. Like here, in *Sommerfield*, the plaintiff (who was Jewish and German) alleged the defendants harassed and discriminated against him because of his religion and national origin. *Id.* at 647. Notably, Mr. Longo requested an hourly rate of only $395 per hour in that case. Despite the recency of that award, Mr. Longo did not address it in his petition here nor explain how his requested hourly rate increased from $395 to $550 per hour. Nor does he explain the justification for a rate of $550 per hour when he was only awarded $300 per hour in *Sommerfield*. In reply to Defendants raising *Sommerfield*, Mr. Longo only argued *Sommerfield* was a completely different case that resulted in a less successful outcome. R. 297 at 5. His response is non-responsive. The relative success in each case may be used to increase the total amount of the fee award through a lodestar enhancement, but it does not justify increasing Mr. Longo's hourly rate, and certainly not at an increase of $250 an hour for work done at a similar time in the same type of case.

Even more recently, on August 23, 2018, a district court found that $360 is a reasonable hourly rate for Mr. Longo's work. *Smith v. Rosebud Farm, Inc.,* 2018 WL

4030591, at *5 (N.D. Ill. Aug. 23, 2018).[2] Mr. Longo presented much of the same evidence in that case as he does here (in fact, with nearly identical affidavits). The *Smith* court found that $360 was a reasonable hourly rate that reflected a 20% increase over the amount Mr. Longo was awarded in *Sommerfield* to account for an increase for inflation and because of the "increasing skill and reputation of the attorney." *Id*. The *Smith* case was likewise similar to this case. There, the African American plaintiff alleged the defendant sexually harassed and racially discriminated against him during his employment, in violation of Title VII and other statutes. *Smith*, 2018 WL 4030591 at *1.

Although these prior fee awards are not dispositive, they are extremely relevant. *See Jeffboat, LLC v. Director, Office of Workers' Comp. Programs,* 553 F.3d 487, 491 (7th Cir. 2009) ("[A] previous attorneys' fee award is useful for establishing a reasonable market rate for similar work."); *People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 90 F.3d 1307, 1312 (7th Cir. 1996) ("While each court should certainly arrive at its own determination as to a proper fee, rates awarded in similar cases are clearly evidence of an attorney's market rate."); *Smith v. Altman*, 2015 WL 5675376, at *4 (N.D. Ill. Sep. 21, 2015) (using the most recent fee award received by plaintiff's counsel in determining his market rate for the current case). Mr. Longo litigated *Smith* between 2012 and 2018, the exact years he litigated this case. For that reason, the Court need not increase his hourly rate between *Smith* and this case

---

[2] The Court acknowledges that the opinion in *Smith* was issued after the parties filed their briefs related to this fee petition. Despite its relevance, however, neither party supplemented its brief with that opinion.

to reflect an increase in Mr. Longo's skill and reputation. *Smith* is simply too recent and too similar to this case to increase that hourly rate here with no evidence presented that an increase is warranted.

### iii. Laffey Matrix

Finally, the Court gives little weight to the Laffey Matrix, which would set Mr. Longo's hourly rate at over $800 per hour based on the fact that he has over 20 years of experience. R. 297-7. The Seventh Circuit has not explicitly endorsed the use of the Laffey Matrix, and has "expressed some skepticism about applying the Laffey Matrix outside of Washington, D.C." *Montanez*, 755 F.3d at 554. Nevertheless, the Seventh Circuit has "left it to trial judges to exercise their discretion in evaluating [the Laffey Matrix's] usefulness in any particular case," *id.*, and some courts in this district have accepted it as evidence of a reasonable hourly rate. *See Hadnott v. City of Chicago*, 2010 WL 1499473, at *7 (N.D. Ill. Apr. 12, 2010) (citing cases and concluding "that the Laffey Matrix is 'satisfactory evidence' of the prevailing rate, so that the burden shifts to opposing counsel to show why a lower rate is essential"). Here, however, the Laffey Matrix is even out of line with the high market rates shown in the third-party affidavits and grossly higher than the approved hourly rates in Mr. Longo's recent cases. For this reason, the Court does not find it useful here.

Based on all the evidence before the Court, including the prior fee awards to Mr. Longo in *Sommerfield* and *Smith* and the Court's familiarity with his work on this case, the Court concludes that $360 is a reasonable hourly rate.

## B. Hours Worked

Once a reasonable hourly rate is determined, the Court must then analyze the number of hours reasonably expended. *Hensley*, 461 U.S. at 434. This analysis excludes "excessive, redundant, or otherwise unnecessary" hours. *Id.* "[T]he court should disallow not only hours spent on tasks that would normally not be billed to a paying client, but also those hours expended by counsel on tasks that are easily delegable to non-professional assistance." *Spegon v. Catholic Bishop of Chicago*, 175 F.3d 544, 553 (7th Cir. 1999). The Court also may reduce the hours calculation "[w]here the documentation of hours is inadequate." *Hensley*, 461 U.S. at 433.

Defendants' response to the fee petition raises two principal issues with the claimed hours: (1) unnecessary hours spent on administrative or non-billable tasks; and (2) excessive hours spent on communications and other tasks. R. 295 at 7-10.

Both parties have a duty to explain their position as to each time record. Objectors to fee petitions should not shift "to the court . . . the objector's responsibility . . . to meaningfully explain why each item claimed to be unreasonable or otherwise noncompensable should be disallowed." *Bd. of Trustees of the Health & Welfare Dep't of the Constr. & Gen. Laborers' Dist. Council of Chicago & Vicinity v. Allison Enterprises, Inc.*, 2016 WL 4397972, at *5 (N.D. Ill. Aug. 18, 2016). Thus, "one-word notations on . . . attorney invoices" such as "vague," "block," "redundant," "excessive," or "unnecessary," are inappropriate. *Id.* at *6. Likewise, "when a fee petition is vague or inadequately documented, a district court may either strike the problematic entries or (in recognition of the impracticalities of requiring courts to do an item-by-

item accounting) reduce the proposed fee by a reasonable percentage." *Harper*, 223 F.3d at 605. "Whichever option the district court chooses, it is required to 'provide a concise but clear explanation of its reasons for the fee award' that is sufficient to permit appellate review." *Id*.

Because of the voluminous time records submitted with Nichols' fee petition— over 400 pages and spanning over five years—the Court will reduce the hours by a reasonable percentage as a result of the excessive billing and errors in the billing records submitted by Nichols' counsel, rather than addressing each problematic entry. To the extent the Court can identify specific hours to reduce, it will do so.

### i. Administrative and Other Non-Billable Tasks

Defendants first ask the Court to deduct entries that are administrative in nature or better suited for support staff. Parties cannot recover attorneys' fees or paralegals' fees for tasks that can be delegated to a non-professional. *Spegon*, 175 F.3d at 553; *Morjal v. City of Chicago*, 2013 WL 2368062, at *2 (N.D. Ill. May 29, 2013) ("[T]ime spent organizing file folders, preparing document[s], assembling filings, electronically filing documents, sending materials, docketing or logging case events into an internal case tracking system, and telephoning court reporters is noncompensable."). The fact that Mr. Longo is a solo practitioner "who has decided to forgo additional support staff does not entitle him to bill professional rates (*i.e.*, attorney rates or paralegal rates) for clerical work." *Smith*, 2018 WL 4030591, at *8.

Specifically, Defendants challenge tasks such as "dictate new date for docket; calendar date; [and] ensure inclusion of new date in docket;" time spent reading court

orders; and commuting time. Upon reviewing Mr. Longo's time entries, the Court will deduct hours for entries relating to dictating new dates. Although it is not entirely clear what tasks counsel is referring to in these entries, these entries appear to relate to internal calendaring—a clerical task—conducted by Mr. Longo. For the same reasons, the Court will deduct time for docketing case events, checking court status (including calling the clerk for an update on various matters), reviewing stamped filings and other administrative documents such as certified mail receipts, calling court reporters, and other clerical tasks.

The Court also deducts time for duplicate entries related to reviewing the CM/ECF email transmitting a docket entry and then separately reviewing the document attached to that docket entry. These entries appear as "received, reviewed electronic mail from court regarding [*i.e.*,] answer to the complaint," and are followed by "received, reviewed [*i.e.*,] defendant's partial answer to the complaint." It is improper for counsel to bill 0.1 hours—equivalent to six minutes each—for reviewing the transmittal email in addition to six minutes or more reviewing the actual docket entry or document filed. On the other hand, time spent reading court orders or other docket filings is certainly compensable.

The Court further deducts time for commuting to the federal courthouse in Chicago. Each one-way trip was billed at 1.4 hours, for a total roundtrip time of 2.8 hours for each appearance. In *Henry v. Webermeier*, the Seventh Circuit stated that there is a presumption in a fee award under 42 U.S.C. § 1988 "that a reasonable attorney's fee includes reasonable travel time billed at the same hourly rate as the

lawyer's normal working time." 738 F.2d 188, 194 (7th Cir. 1984). But "*Henry* does not support the proposition that an award of attorneys' fees includes time spent commuting." *Riddle v. Nat'l Sec. Agency, Inc.*, 2010 WL 1655443, at *6 (N.D. Ill. Apr. 23, 2010) (refusing to award travel time for commuting to court from the suburbs as part of travel time, noting "[i]t cannot be assumed that a paying client would pay $490 dollars more (the fee for two travel hours) for each court appearance because Mr. Fuoco moved his practice further from the courthouse."); *see also Franks v. MKM Oil, Inc.*, 2016 WL 861182, at *7 (N.D. Ill. Mar. 7, 2016) (refusing to award travel time for commuting to court from the suburbs as part of travel time). Consistent with *Riddle* and *Franks*, the Court finds travel time for commuting from the suburbs is not compensable as part of a fee award. Of note, the Court allows parties to appear by phone and encourages parties to do so to avoid unnecessary expense to clients and wasted time to counsel, making travel time even less necessary for all but the trial or lengthy contested hearings. Mr. Longo chose to have his office in the suburbs where office rents are presumably lower. Choosing an office with a shorter commute home or a more pleasant work environment than downtown Chicago is certainly understandable. But the costs of those conveniences should not be incurred by an opponent. As a result, Mr. Longo must assume as part of his overhead costs the cost of commuting to the courthouse that he chose to file suit in. The Court thus reduces the lodestar by 109.20 hours, representing 39 trips. The Court does not include time spent traveling to depositions in this calculation, which are compensable.

The Court also deducts time for filing documents and drafting notices of motions, but finds that these hours should be credited to a paralegal. *See, e.g., Williams v. Z.D. Masonry, Corp.*, 2009 WL 383614, at *5 (N.D. Ill. Feb. 17, 2009) ("In light of the problems that can result from a botched electronic filing, the court will not second-guess the firm's decision that such filing must be overseen by a paralegal."). Nichols cites to cases awarding paralegals hourly rates ranging from $90 per hour, *Franks v. Mkm Oil, Inc.*, 2016 WL 861182, at *9 (N.D. Ill. Mar. 7, 2016), to $195 per hour, *Webb v. CBS Broad., Inc.*, 2011 WL 4501366, at *2 (N.D. Ill. Sept. 28, 2011). The court in *Smith* determined that $125 an hour was a reasonable rate for similar paralegal work done by Mr. Longo. 2018 WL 4030591, at *9 (finding an hourly rate of $125 to be reasonable for paralegal work related to filing court documents and notices of motions). Defendants have not taken a position on the reasonable hourly rate for a paralegal in this case. Based on a review of the cases cited by Nichols, and the recent *Smith* case, the Court finds that an hourly rate of $125 is reasonable for the paralegal work performed in this matter. Accordingly, Nichols is awarded $125 per hour for the 16.2 hours spent filing court documents electronically and 2.3 hours spent drafting notices of motions.

In sum, the Court deducts 109.2 hours from the lodestar for commuting time. The Court also deducts 18.5 hours for work that could have been performed by a paralegal and awards a paralegal rate of $125 per hour for those hours. For the clerical entries, the Court will deduct a percentage of the total remaining hours. The entries reflecting clerical work were numerous, comprising the majority of the bill.

But because these entries were usually billed at .1 or .2 hours, the Court deducts only 10% from the remaining hours to account for the clerical work discussed above and not specifically calculated. After these deductions, the lodestar is reduced from 3,107.9 to 2,682.1 hours for attorney work and 18.5 hours are added at paralegal rates.

### ii. Excessive, unnecessary, and redundant billing

Defendants next point out the excessive amount of time Nichols' counsel spent reviewing correspondence from Nichols, defense counsel, and other parties. Every time counsel corresponded with any individual via email he billed at least 0.1 hours for what he called "review, revise correspondence." Counsel also billed at least 0.2 hours every time he received an email, billing "received, reviewed . . . correspondence." These entries are duplicative and excessive. *Taylor v. Law Offices of Vincent Peter Cignarale, LLC,* 2011 WL 6102020, at *2 (N.D. Ill. Dec. 5, 2011) (finding billing in 0.1 hour increments for each email received, amounting to six minutes expended per email, excessive and reducing by two-thirds those fees). To list just a few more of many, *see* 02/22/12 entries (multiple entries for reviewing correspondence from plaintiff regarding 90-day time frame); 01/23/13 entries (billing .5 hours (in three separate entries) for receiving, reviewing, and corresponding with the court reporter regarding a deposition scheduled for the following day); 04/09/16 entries (multiple entries to determine whether Nichols responded to counsel's correspondence); 08/21/16 entries (five entries, all for .2 hours, for reviewing correspondence with plaintiff regarding supervisor's truck); 3/28/17 entries (similar).

While the Court recognizes that some of these entries were redacted, that does not change the fact that Nichols has the burden of supporting his fee request, and he has not demonstrated that these imprecise and duplicative entries are reasonable.

Defendants also argue that Nichols' counsel billed an excessive amount of time on tasks that should have taken less effort than that billed, pointing specifically to the 284.8 hours counsel billed on the summary judgment response, and 250.1 hours counsel billed analyzing Defendants' documents. *See* R. 295 at 9-10. This is simply ridiculous, and the Court agrees that the hours for summary judgment are excessive—Nichols only responded to Defendants' summary judgment motion and did not file a motion of his own. The issues in the motion were not so significant or complicated that an experienced lawyer with over 30 years of experience in the field should have spent almost 300 hours—equivalent to six full weeks at 50 hours a week—simply responding to Defendants' motion for summary judgment. Further, the response was not particularly effective or well-organized (*see* R. 148) to indicate that Mr. Longo spent six weeks meticulously researching and crafting his arguments. No paying client would tolerate this.

As another particularly egregious example, counsel spent over 10 hours reviewing the transcript of a deposition that he took, and which lasted less than five hours itself. *See* 10/01/12 entry (noting the deposition of Carmen Iacullo *and* Jim Stumpner lasted five hours); 03/14/15 entry (reviewing Iacullo's transcript for 6.2 hours); 03/16/15 entry (reviewing Iacullo's transcript for 4.9 hours); 03/19/15 entry

(reviewing Iacullo's transcript for .3 hours). It is unreasonable to review a deposition transcript for five times longer than the deposition itself lasted.

As to the hours spent reviewing Defendants' documents, the Court does not include these hours in its reduction. The Court does not know how many documents Defendants produced to Nichols (during various hearings, Mr. Longo indicated the number was over 17,000) nor how complicated and organized those documents were to make a determination as to whether the hours spent were unreasonable.

Upon the Court's review of the records, many of the other entries in Mr. Longo's fee petition are unreasonable or excessive on their face. Counsel billed one hour for each hearing he attended, regardless of how long the hearing actually lasted. Notably, when a hearing was longer than one hour, counsel billed for that extra time. *See* 09/09/15 entry regarding summary judgment oral argument. These entries are particularly excessive because most of the hearings counsel billed for were before this Court, which allows counsel to appear by phone for routine status and motion hearings.

In the following examples, the Court's daily motion call always began at 9:00am, and there was no magistrate judge hearing also set for that day. On 07/01/13, Mr. Longo billed one hour for attending a hearing before this Court. *Nichols* was the third case out of six cases called in a relatively short call—the call ended at 10:07am. On 01/27/14, *Nichols* was the second case called before the Court. The first case called last no more than a couple of minutes. The Court's review of its notes indicates that *Nichols* also lasted no more than five minutes, and in no event did it last an hour. Mr.

Longo again billed a full hour for this hearing. On 04/22/15, *Nichols* was the first case called. The status lasted no more than five minutes, and the entire call (consisting of six cases) ended at 9:39am. Mr. Longo billed an hour for that status. On 10/06/16, the call ended at 9:39am—*Nichols* was the second to last case called. There was one case called after *Nichols*, and the Court even waited a few minutes for counsel to appear in that case. These examples indicate Mr. Longo billed an hour for each status (including for waiting in court for the case to be called) for status hearings that could not possibly have lasted an hour.

Mr. Longo also billed for time he waited between hearings. For example, on 10/02/12 (before the case was transferred to this Court), counsel billed one hour for attending a hearing on a motion to extend the discovery cutoff, followed by .6 hours for waiting "for next hearing with magistrate judge on status of discovery" followed by another hour for the hearing with the magistrate judge. Of course, it is blatantly inappropriate to bill an hour for a hearing that did not last an hour. But at the very least, the Court will not award fees for "waiting" between hearings when Mr. Longo could have come prepared to use the time for other work.

Finally, Mr. Longo billed at least 8.7 hours that he spent working on this fee petition from May 8, 2017, mostly related to his correspondence with the declarants in support of his hourly rate and the reasonableness of his fees. These hours may be significantly higher because many of the billing entries described as "time records" are vague and could be attributed either to Nichols' request for equitable relief or to Mr. Longo's request for attorney's fees. Thus, although the Court does not reduce the

fee award by these hours directly, it does take the hours spent on the fee petition but billed here and these vague entries into account in its reduction here.

The Court's reduction is bolstered by the Court's direct experience with Mr. Longo's litigation style. For example, Mr. Longo's refusal to hire a court reporter for depositions he was taking of defense witnesses led to the filing of an emergency motion by Defendants to induce compliance of the Federal Rules of Civil Procedure. R. 40. Mr. Longo billed for the research related to that issue! *See* 9/23/2012 entry. After Mr. Longo outrageously served 370 interrogatory and document requests (including subparts) on Defendants, Judge Finnegan stated that she had "never seen such broad discovery . . . There was a lot of redundancy here. It was way overbroad. And I think if you had been narrowed and said, okay, you can ask for 40 document requests, you would have focused a little more on what you really need and been more careful in the drafting. They were hard to follow. It took me a long time. I'm sure it took opposing counsel a long time to figure out what you are asking and then to answer all of these. And it is not productive." R. 82 at 44-45. Judge Finnegan instructed Mr. Longo to not issue any more discovery requests without leave of the Court. *Id*. In this Court's experience with thousands of cases, it is the rarest of cases that results in such a prohibition. Nonetheless, without such leave, Mr. Longo sought additional documents through emails to the Defendants. *See* R. 65-5.

Mr. Longo also filed frivolous motions and made frivolous arguments. On April 28, 2017—after the verdict and while the parties were briefing equitable issues—the Court denied a number of motions brought by Nichols as frivolous, and instructed

Mr. Longo to exclude them from his fee petition. *See* R. 277 at 3-5. During that same hearing, the Court also cautioned Mr. Longo to "be very careful about" doing additional research, explaining that:

> "You're free to put any amount of time you want into this case, but I doubt it's going to be compensated for under a fee petition when you make what I view as a number of frivolous arguments, a number of irrational or illogical positions throughout this memo and are prolonging a case unnecessarily . . . You have a client to represent efficiently, and at this point you have a defendant that has to pay your fees. And I view some of this as an attempt – quite candidly, sir, I view some of this as an attempt to take advantage of the fact that they're paying your fees now.

*Id.* at 10. Simply, this case would not have been nearly as long nor as expensive had Mr. Longo litigated it efficiently.[3] No rational paying client would have stood for this

---

[3] Other courts have had similar perceptions. *See Sommerfield*, 2012 WL 5354987, at *16 (noting "Mr. Longo's pattern of filing frivolous and unsupported motions, arguing the same point over and over, refusing to take no for an answer, filing motions that pretended as though adverse rulings had not been made against him, seeking to avoid the consequences of rulings that did not favor him, ignoring prior rulings, and making captious and unreasonable arguments for which he now seeks full compensation."); *Smith*, 2018 WL 4030591, at *4 ("Mr. Longo did not litigate this case efficiently. Even a cursory review of the docket reveals that Plaintiff's submissions regularly cited incorrect and/or irrelevant authorities and often were of questionable necessity or utility. To his credit, Mr. Longo prevailed in hotly-contested litigation. But many of his briefs reflected a penchant for overkill, turning simple arguments into lengthy dissertations that often obscured more than they clarified."); *Atkins v. City of Chicago,* 631 F.3d 823, 833 (7th Cir. 2011); ("This case has been unnecessarily challenging because, as my colleagues point out, the attorney for the late Mr. Atkins [Mr. Longo] has buried one solid claim in a crowd of hopeless claims against virtually every potential defendant in sight.") (J. Hamilton, *concurring*); *Greisz v. Household Bank (Illinois), N.A.*, 176 F.3d 1012, 1014 (7th Cir. 1999) ("[Mr. Longo] has filed untimely appeals, failed to protect the right of clients to opt out of doomed class actions, engaged in flagrant forum shopping, made exorbitant settlement demands, filed frivolous motions, displayed a lack of familiarity with procedural rules—and in the end always lost," and collecting cases describing a history of other improper, untimely, and otherwise unsuccessful attempts by Mr. Longo to litigate cases). In his briefs, Mr. Longo failed to recognize these cases as criticism and instead explained

and paid for all of Mr. Longo's excessive and wasteful hours. So too, no defendant should be forced to pay for these excessive and wasteful hours.

Given the number of entries Nichols claims for excessive, redundant, or unnecessary work in the 400 plus pages of billing records submitted, the Court finds it appropriate to deduct a percentage of the remaining hours. The Court therefore will reduce the overall attorney time claimed by Mr. Longo—after all other reductions have been applied—by 20 percent for the significant excessive, unnecessary, and vague billing represented here. This percentage is more than some cases where, for example, the billing entries were flawed in only one way. It is also less than in other cases where excessive billing occurred. *See Fields v. City of Chicago*, 2018 WL 253716, at *9 (N.D. Ill. 2018) (applying a 5% across-the-board reduction in the hours claimed by a law firm to account for duplicative billing); *Envirogen Techs., Inc. v. Maxim Constr. Corp., Inc.*, 2017 WL 5904663, at *6 (N.D. Ill. Jan. 24, 2017) (applying an across-the-board reduction of 15% in the number of hours recoverable as a result of concerns relating to the thoroughness of submissions); *Obrycka v. City of Chicago*, 2013 WL 1749803, at *5 (N.D. Ill. Apr. 23, 2013) (50% reduction for redundancy); *Duran v. Town of Cicero*, 2012 WL 1279903, at *15 (N.D. Ill. Apr. 16, 2012) (vague entries, block billing, and failure to identify time spent on unsuccessful claims

---

that Judge Posner is known for criticism (which is not an adequate substantive response), that Defendants "recklessly place plaintiff in a false light" in violation of the "civility in the Code of Professional Responsibility," and that the cases were irrelevant in any event. R. 297 at 12-13. This blame-shifting does not help Mr. Longo. It simply highlights a pattern of conduct that is tellingly similar to the conduct here without any plausible exculpatory explanation. Moreover, it is not uncivil to correctly quote from prior cases criticizing the same conduct challenged here.

resulted in a 50% reduction). In any event, merely reducing the claimed time by 20 percent is modest given the excessive billing and the way the case was litigated by Mr. Longo.[4]

In sum, the Court deducts a total of 962.1 hours for excessive, redundant, or unnecessary work performed by Mr. Longo. After making the adjustments discussed above, the lodestar is $774,584.50.[5]

| Rate | Total Adjusted Hours | Adjusted Rate | Adjusted Fees |
|---|---|---|---|
| Attorney Rate | 2,145.8 | $360 | $772,282.00 |
| Paralegal Rate | 18.5 | $125 | $2,312.50 |
| | Total | | $774,584.50 |

## II. Lodestar Adjustment

The lodestar of $774,584.50 is presumptively reasonable, and the Court does not find any basis for either an upward or downward adjustment. Nichols seeks an upward adjustment, citing the risk associated with contingency-fee cases and the

---

[4] A 20 percent reduction results in a cut of about 500 hours. Had the Court conducted a line by line review of the hundreds of pages of billing records, the reduction likely would have been more than this amount. For example, the Court would have cut 200 hours for the summary judgment hours alone.

[5] For reference, the Court's calculation based on the above is:

| Reduction Basis | Hours Reduced | Remaining after Reduction |
|---|---|---|
| Commuting | 109.2 | 2,998.7 |
| Paralegal Hours | 18.5 | 2,980.2 |
| 10% Decrease for Clerical Work | 298.0 | 2,682.2 |
| 20% Decrease for Excessive Billing | 536.4 | 2,145.8 |
| **Total** | **962.1** | 2,145.8 |

difficulty of winning an employment discrimination case brought by a Muslim plaintiff. R. 290 at 17-21. While the Court recognizes and acknowledges the substantial recovery Mr. Longo achieved for his client, this case was not the exceptional case warranting an upward adjustment. Employment discrimination and retaliation cases often are brought by marginalized members of society and it is uniquely these members that Title VII was designed to protect. Further, enhancements are not appropriate simply because the case was taken on a contingency basis and Mr. Longo had to litigate the case without pay for several years. *Pickett*, 664 F.3d at 645 ("[C]ourts cannot enhance the lodestar to account for the risk of nonpayment incurred by attorneys who take cases pursuant to contingent fee agreements.") (citing *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992)). The risk associated with this case is adequately compensated through the payment of this significant fee award and no further increase is warranted. The Court also declines to award an upward adjustment to deter Defendants from engaging in these practices again—Defendants are sufficiently deterred for their conduct through the significant compensatory and equitable damages they paid, and the still significant amount of attorney's fees they will pay pursuant to this opinion.

A downward adjustment also is inappropriate. Defendants argue that Mr. Longo's: "(1) dilatory tactics; (2) redundant and unnecessary motion practice; (3) excessive, redundant, and unwarranted communications with his client and opposing counsel; (4) misrepresentations and mischaracterizations of both facts and communications; and (4) filing of frivolous motions not just in this case but in several

other cases Mr. Longo has handled, necessitates a downward departure of the lodestar." R. 295 at 12. While the Court agrees that this characterization accurately describes much of Mr. Longo's litigation style in this case, it finds that the significant reduction in hours above adequately accounts for these issues.

### III. Fees on Fees

Finally, Nichols seeks leave to present his time records after June 22, 2017, reflecting work spent on this fee petition. R. 290 at 1 n.1. It is well-established that a prevailing plaintiff in a civil rights case may in some circumstances recover fees on fees. *See Ustrak v. Fairman*, 851 F.2d 983, 987-90 (7th Cir. 1988). But a "request for attorney's fees should not result in a second major litigation." *Hensley*, 461 U.S. at 437. The Seventh Circuit also has frowned upon the fact that "lawyers litigate fee issues with greater energy and enthusiasm than they litigate any other type of issue." *Spegon*, 175 F.3d at 554. Along these principles, a fee applicant should exercise "billing judgment" and "make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434.

As detailed above, Nichols did not show such billing judgment here or exclude in good faith hours that are excessive, redundant, or otherwise unnecessary. Instead, it appears Mr. Longo included almost every single hour worked on this case for every administrative, substantive, and travel task. His only explanation or argument in support of the number of hours he requests is that he recovered a substantial victory for his client, and as such is entitled to the full amount of his fees. But Nichols is entitled only to fees *reasonably* expended, not to every fee request no matter how

inflated. Nichols also argues that the Court should award Mr. Longo his full fees because Defendants did not agree to Nichols' fees. The Court does not find this circular and frivolous argument persuasive given the significant unculled time—perhaps also explaining Defendants' unwillingness to agree without objection to Nichols' fee petition. Despite being reprimanded for similar practices by multiple courts in several previous litigations, Mr. Longo's continued failure to litigate cases efficiently and submit reasonable bills is further justification to deny fees on fees.

For these reasons, taking "a look at the litigation in its two phases—merits and fees—and from this examination, structur[ing] an award that is reasonable in light of all the circumstances of the case," *Sommerfield*, 2017 WL 3675722, at *5, the Court declines to award any "fees on fees" in this litigation. *See In re Burlington Northern, Inc. Employment Practices Litig.*, 832 F.2d 430, 434 (7th Cir. 1987) (noting that "a fees award for fees litigation can be reduced even to nothing, so that the award is reasonable when considered in light of all the circumstances of the case."). The almost $800,000 that the Court awards Mr. Longo for his work on this case sufficiently—and richly—compensates him for his time in helping Nichols succeed on his claims.

## IV.    Costs

The Court also awards Nichols $4,061.02 in agreed costs. *See* R. 290 at 21 and R 295 at 15.

## Conclusion

For the foregoing reasons, the Court grants Nichols' petition, R. 290, in part and awards **$**774,584.50 in attorney's fees and $4,061.02 in costs, for a total amount of $778,645.50.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: January 10, 2019